Harold F. RICE, Plaintiff,

v.

Benjamin J. CAYETANO, Governor of the State of Hawaii, Defendant.

Clara Pila Akana Leong KAKALIA, Stephen Teruo Kubota, Lela Malina Hubbard and Billie Martha Mary Ah Ung Kawaiola Fernandez Beamer, Plaintiffs,

v.

Benjamin CAYETANO, Governor of the State of Hawai'i, Samuel Callejo, Comptroller of the State of Hawai'i, Solomon Kahoohalahala, Davianna McGregor, Ululani Beirne, Analu Berard, Olani Decker, Sherry Evans, Allen Hoe, Barbara Kalipi, Natalie Kama, Kinau Kamalii, Mahealani Kamauu, Kaipo Kanahale, Kawehi Kanui–Gill, Sabra Kauka, Bruss Keppeler, Poka Laenui, William Meheula, Michael Minn, Ann Nathaniel, and Ao Pohaku Rodenhurst, All of Whom are Sued Both Individually and In Their Capacities, Defendants.

Civil Nos. 96–00616 DAE, 96–00390 DAE.

United States District Court,
D. Hawai'i.

Sept. 6, 1996.

Thomas T. Watts, Kemper & Watts, Honolulu, HI, for Clara Pila Akana Leong Kakalia, Stephen Teruo Kubota, Lela Malina Hubbard, Billie Martha Mary Ah Ung Kawaiola Fernandez Beamer.

Winfred K.T. Pong, Office of Attorney General, Honolulu, HI, for Benjamin Cayetano, Ululani Beirne, Samuel Callejo; Kaipo Kanahele, Poka Laenui.

Winfred K.T. Pong, Office of Attorney General, Honolulu, HI, Jon M. Van Dyke, Honolulu, HI, for Solomon Kahoohalahala, Analu Berard, Olani Decker, Sherry Evans, Allen Hoe, Barbara Kalipi, Natalie Kama, Kinau Kamalii, Sabra Kauka Bruss Keppeler, William Meheula, Michael Minn, Ann Nathaniel, Ao Pohaku Rodenhurst, Kawehi Kanui–Gill.

Winfred K.T. Pong, Office of Attorney General, Honolulu, HI, Hayden Aluli, Honolulu, HI, for Davianna McGregor.

Winfred K.T. Pong, Office of Attorney General, Honolulu, HI, David Bettencourt, Honolulu, HI, for Mahealani Kamauu.

Poka Laenui, Waianae, HI, pro se.

John W. Goemans, Honolulu, HI, for Mark J. Seidenberg.

David L. Ross, Law Offices of David L. Ross, Los Angeles, CA, John W. Goemans, Law Offices of John W. Goemans, Kamuela, HI, for Harold F. Rice.

Winfred K.T. Pong, Deborah Day Emerson, Office of the Attorney General, Honolulu, HI, John P. Dellera, Department of Attorney General, Honolulu, HI, for Benjamin J. Cayetano.

Winfred K.T. Pong, Deborah Day Emerson, Office of Attorney General, Honolulu, HI, for Mazie K. Hirono.

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DAVID ALAN EZRA, District Judge.

The court heard Plaintiffs' Motion on August 30, 1996. John Goemans, Esq., appeared on behalf of Plaintiff Harold Rice ("Rice"); Thomas A. Watts, Esq., appeared on behalf of Plaintiffs Clara Pila Akana Leong Kakalia, Stephen Teruo Kubota, Lela Malina Hubbard, and Billie Martha Mary Ah Ung Kawaiola Fernandez Beamer ("Kakalia Plaintiffs," or "Plaintiffs" when referenced together with Rice); Deputy Attorney General Winfred K.T. Pong appeared on behalf of all State Defendants (in their official capacities) and Defendants Benjamin Cayetano and Samuel Callejo in their Individual Capacities in Civil No. 96–00616 DAE; Deputy Attorney General John P. Dellera appeared on behalf of Defendant Benjamin Cayetano in Civil No. 96–00390 DAE; Jon M. Van Dyke, Esq., appeared on behalf of Defendants Solomon Kahoohalahala, Analu Berard, Olani Decker, Sherry Evans, Allen Hoe, Barbara Kalipi, Natalie Kama, Kinau Kamalii, Sabra Kauka, Bruss Keppeler, William Meheula, Michael Minn, Ann Nathaniel, and Ao Pohaku Rodenhurst ("HSEC Defendants"); David Bettencourt, Esq., appeared on behalf of Defendant Mahealani Kamauu in her individual capacity; and Hayden Aluli appeared on behalf of Defendants Davianna McGregor and Kawehi Kanui–Gill in their individual capacities. After reviewing the motion and the supporting and opposing memoranda, the court DENIES Plaintiffs' Motion for Preliminary Injunction.

## BACKGROUND

This matter arises from two separate cases[1] brought by individuals challenging the constitutionality of the State of Hawaii's role in organizing Hawaiian citizens to redress the federal government regarding Native Hawaiian rights and possible sovereignty. Both Rice and the Kakalia Plaintiffs challenge the constitutionality of Act 359 of the 1993 Hawaii Legislature, as amended by Act 200 of the 1994 Legislature and Act 140 of the 1996 Legislature. Rice Complaint at 3; Kakalia Complaint at ¶ 1.

### Act 359 as Amended

Act 359 ("Act 359" or "the Act") is a state legislative act relating to Hawaiian Sovereignty. The stated purpose of this Act is "to acknowledge and recognize the unique status the native Hawaiian people bear to the State of Hawaii and to the United States and to facilitate the efforts of native Hawaiians to

1. Civil Nos. 96–00390 DAE and 96–00616 DAE were consolidated for purposes of hearing and adjudication of claims in connection with the Native Hawaiian Vote. See August 2, 1996 Order Consolidating Cases in Part.

be governed by an indigenous sovereign nation of their own choosing." 1993 Haw.Sess. Laws, Act 359, § 2. Act 359 established a Hawaii sovereignty advisory commission to advise the legislature in carrying out the purpose of this Act. The Commission's mandate included advising the legislature on: (1) conducting special elections related to this Act; (2) apportioning voting districts; (3) establishing the eligibility of convention delegates; (4) conducting educational activities for Hawaiian voters, a voter registration drive, and research activities in preparation for the convention; (5) establishing the size and composition of the convention delegation; and (6) establishing the dates for a special election. *Id.* at § 4. The advisory commission was also to be responsible for submitting a plan to the 1994 legislature on the qualifications of voters and the conduct of special elections to implement the purposes of Act 359. *Id.* at § 7. Act 359 appropriated $420,-000 for the fiscal year 1993–94—half of the appropriation is from general funds, and the other half is from revenues generated under the authority of section 5(f) of the Admission Act of 1959.[2]

Act 359 was subsequently amended during the 1994 Session Laws by Act 200. Act 200 created the Hawaii Sovereignty Elections Council ("HSEC") and gave HSEC two specific mandates: (a) "[h]old a plebiscite in 1995, to determine the will of the indigenous Hawaiian people to restore a nation of their own choosing;" and (b) "[s]hould the plebiscite be approved by a majority of qualified voters, provide for a fair and impartial process to resolve the issues relating to form, structure, and status of a Hawaiian nation." 1994 Haw.Sess.Laws, Act 200, § 2. Act 200 also appropriated an additional $1.8 million for the Act during 1994–95 fiscal year.[3] Finally, Act 200 provided the following disclaimers: (a) "Nothing in this Act shall be construed to require the State to expend or appropriate funds beyond those appropriated in this Act;" and (b) "Nothing arising out of the Hawaiian convention provided for in this Act, or any result of the ratification vote on proposals from the Hawaiian convention, shall be applied or interpreted to supersede, conflict, waive, alter, or affect the constitution, charters, statutes, laws, rules, regulations, or ordinances of the State of Hawaii or its political subdivisions...." *Id.* at §§ 13–14.

Act 359 was again amended during the Hawaii State Legislature's regular session in 1996. *See* 1996 Haw.Sess.Laws, Act 140. Act 140 of the 1996 legislative session brought Act 359 current and made a few substantive changes.[4]

The actions authorized by and subsequent effect of these three legislative acts, viewed cumulatively, are at issue here. For purposes of clarity, the court will hereinafter use the term "Act 359" to refer to the Act as amended by the 1994 and 1996 legislative sessions unless otherwise specified.

**2.** The Admission Act creates a compact between the United States and the State of Hawaii, whereby the federal government transferred land to the State to hold in public trust for the people of Hawaii. Admission Act, Pub.L. No. 86–3, 73 Stat. 5 (1959). Section 5(f) of the Admission Act, 1959 provides that part of the proceeds of the trust lands are to be used "for the betterment of the conditions of Native Hawaiians." *Id.*

**3.** Act 200 provided for a sum of $900,000 out of the general revenues of the State of Hawaii, "or so much thereof as may be necessary for the fiscal year 1994–95, for the purpose of this Act" and "a dollar-for-dollar match of funds which are derived solely from revenues generated under the authority of section 5(f) of the Admission Act." 1994 Haw.Sess.Laws, Act 200, § 12.

**4.** Act 140 modified Act 359 in several ways. First, the wording of the purpose of the Act was modified to read: "The purpose of this Act is to acknowledge and recognize the unique state that the Native Hawaiian people bear to the State of Hawaii and to the United States and to facilitate the efforts of the Native Hawaiian people to determine [their will to be governed by an indigenous sovereign nation] *self-governance* of their own choosing." *Id.* at § 2 (deletions in brackets, additions underlined). Act 140 also authorized a date change for the plebiscite vote scheduled to be held in 1995 with the designated "Native Hawaiian Vote in 1996." *Id.* Moreover, Act 140 provided HSEC authority to proceed with its plans for a convention of delegates based on a favorable response from a majority of "ballots cast" rather than a majority of "qualified voters" as originally planned. *Id.* Finally, Act 140 authorized an extension of the $1.8 million appropriation through fiscal year 1995–96. *Id.* at § 12.

### Hawaiian Sovereignty Election Guidelines and Procedures

Act 359 only provides for the Native Hawaiian Vote in general terms. The HSEC Hawaiian Sovereignty Election Guidelines and Procedures for the Native Hawaiian Vote ("Guidelines"), adopted by the State legislature in May 1996, set forth specific details such as voter qualifications, and the election timetable. According to the Guidelines, suffrage in the Native Hawaiian Vote is restricted as follows:

(a) To be eligible to be registered to vote in the Native Hawaiian Vote, a person must meet both of the following qualifications:

(i) The person shall be Hawaiian; and

(ii) The person shall have reached the age of eighteen years or shall be seventeen years of age and shall reach eighteen years of age by September 2, 1996.

*See* Guidelines, attached to State Defendants Opp., Exh. E, § 3–1. The guidelines define the term "Hawaiian" as "any descendant of the indigenous people inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands prior to 1778." *Id.* at § 2–5; *see also* Haw.Rev.Stat. § 10–2.[5]

The Native Hawaiian Vote ballots ask: "Shall the Hawaiian people elect delegates to propose a Native Hawaiian government?" State Defendants Opp., Exh. A & Exh. E, § 5–2. An estimated 85,000 ballots were distributed before July 1, 1996. Ballots were sent to registered "Native Hawaiian" voters, some of whom do not currently reside in the State of Hawaii. The voting period was designated from July 1 to August 15, 1996. To be counted, all ballots must have been received by HSEC by 6 p.m. on August 15, 1996. The votes were, in fact, counted on August 23 and 24, 1996.

### *PROCEDURAL HISTORY*

Rice originally filed a complaint for declaratory and injunctive relief in Civil No. 96–00390 DAE on April 25, 1996. He twice amended his complaint on June 6 and July 17, 1996 respectively. His second amended complaint alleges in relevant part that the Native Hawaiian Vote violates his rights under the Fourteenth and Fifteenth Amendments of the United States Constitution, the Voting Rights Act, the Civil Rights Acts, and various provisions of the Hawaii State Constitution. Subsequently, on July 24, 1996, the court denied Rice's motion for the convening of a three-judge district court. On August 2, 1996, the court consolidated Rice's case with the suit brought by Kakalia Plaintiffs for the purposes of hearings and adjudication with respect to the constitutional challenges to the 1996 Native Hawaiian Vote. *See* August 2, 1996 Order Consolidating Cases in Part.

The Kakalia Plaintiffs filed their complaint for declaratory and injunctive relief on July 18, 1996. The Kakalia Plaintiffs seek a declaratory judgment that Act 359 (as amended by Acts 200 and 140) violates the following: (a) Article VI (the Supremacy Clause) of the United States Constitution; (b) their rights under the First and Fourteenth Amendments of the United States Constitution; (c) the Admission Act of 1959; and (d) 42 U.S.C. § 1983 (deprivation of rights under the color of state law). On July 19, 1996, they filed the instant motion for preliminary injunction. And on July 31, Kakalia Plaintiffs filed a motion for temporary restraining order to temporarily enjoin the tabulation and announcement of the results of the Native Hawaiian Vote.

On August 16, 1996, this court granted in part and denied in part Plaintiffs' Motion for a Temporary Restraining Order. The court

---

**5.** Haw.Rev.Stat. § 10–2 defines "Hawaiian" as "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." "Native Hawaiian" is defined as:

[A]ny descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, amended; provided the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii.

Haw.Rev.Stat. § 10–2.

enjoined disclosure of election results and ordered ballots sealed until this court had an opportunity to hear and fully adjudicate the claims before it on preliminary injunction.

Before the court is a motion for preliminary injunction. Plaintiffs seek to enjoin the Defendants, their agents, servants, employees, and all persons acting under, in concert with, or for them, from (1) paying any funds or monies for the purposes of Act 359, (2) tabulating the ballots from the Native Hawaiian Vote,[6] (3) conducting and preparing to conduct elections of convention delegates, and (4) taking any other action to implement Act 359. Defendants filed several memoranda in opposition [7] to Plaintiffs' Motion.

### STANDARD OF REVIEW

■ In the Ninth Circuit the standard for issuing a preliminary injunction is the same as the standard for temporary restraining orders: the court must apply a "sliding scale" analysis in balancing the plaintiff's likelihood of success on the merits with the hardships that would be caused to the plaintiff, the defendant, or the public if the injunction were granted or denied. *Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1389 (9th Cir.1988). Thus, to obtain a preliminary injunction, the plaintiff must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions on the merits are raised and the balance of hardships tips sharply in its favor. *Id.* (citations omitted). "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Senate of State of Calif. v. Mosbacher*, 968 F.2d 974, 977–78 (9th Cir. 1992) (quoting *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir.1991) (citations omit-

ted)). With respect to the injury requirement, "the party seeking the injunction must demonstrate that it will be exposed to some significant risk of irreparable injury.... A plaintiff must do more than merely allege imminent harm sufficient to establish standing, he or she must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Associated Gen. Contractors of Cal., Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991), *cert. denied*, 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992).

■ These formulations are not different tests but represent two points on a "single continuum," such that "[i]f the balance of harm tips decidedly toward the plaintiff, the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Venetie*, 856 F.2d at 1389 (citations omitted).

■ Finally, in cases involving the public interest, the court must also examine whether the public interest favors the plaintiff. *Fund for Animals v. Lujan*, 962 F.2d 1391, 1400 (9th Cir.1992) (citing *Caribbean Marine Serv. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988); *Northern Alaska Environmental Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986)).

### DISCUSSION

#### I. Success on the merits

Plaintiffs argue that they are likely to prevail on their claims for declaratory and injunctive relief on grounds that Act 359 is unconstitutional and a violation of their civil rights. The Kakalia Plaintiffs, who are eligible to vote in this election, espouse that the election is illegal because it violates the su-

---

6. The court previously ruled at the hearing for a temporary restraining order that Defendants could tabulate the results, but not disclose them without further order of the court.

7. There were five memoranda filed in opposition of this motion for preliminary injunction: the Attorney General's Office filed on behalf of all State Defendants (in their official capacities) and Defendants Benjamin Cayetano and Samuel Callejo in their Individual Capacities; Jon M. Van Dyke, Esq., filed on behalf of HSEC Defendants; David Bettencourt, Esq., filed on behalf of Defen-

dant Mahealani Kamauu in her individual capacity; Hayden Aluli, Esq., filed on behalf of Davianna McGregor and Kawehi Kanui–Gill in their individual capacities and joined in HSEC Defendants' Memorandum in Opposition; and Defendant Poka Leanui (Hayden Burgess) filed an opposition and response on his own behalf.

Additionally, the Board of Directors of the Native Hawaiian Bar Association submitted an amicus curiae brief in opposition to Plaintiffs' Motion without leave of court.

premacy clause (Article VI), the equal protection clause (Fourteenth Amendment), their freedom of speech (First Amendment), and their civil rights under the Admission Act and 42 U.S.C. § 1983. Rice, who is not "Hawaiian" as defined by the Act, and therefore not eligible to vote, further contends that the Native Hawaiian Vote violates his right of suffrage under the Fourteenth and Fifteenth Amendments, the Civil Rights Act of 1866 and 1871, the Voting Rights Act of 1965, and Article I, § 5 and Article II, § 1 of the Hawaii State Constitution.[8] Plaintiffs claim to have taxpayer standing to bring these claims, *see Hoohuli v. Ariyoshi,* 741 F.2d 1169, 1180 (9th Cir.1984).

Defendants dispute these claims and urge the court to deny the preliminary injunction as being an unjustified remedy for, what they contend are, meritless claims. The court will consider each of these arguments in turn.

## A. Standing and Ripeness

 In the Ninth Circuit, taxpayers have standing to file a taxpayer suit if their complaint sets forth a sufficient nexus between taxpayer, tax dollars, and the allegedly illegal government activity. *See Hoohuli,* 741 F.2d at 1178 (citing *Doremus v. Board of Education,* 342 U.S. 429, 433–34, 72 S.Ct. 394, 396–97, 96 L.Ed. 475 (1952)). Plaintiffs here are taxpayers in the State of Hawaii who seek to enjoin the expenditure of state funds for allegedly illegal government activity promulgated by Act 359. Under these facts, Plaintiffs satisfy the *Hoohuli* test. Accordingly, the court finds that they have sufficient standing to bring a taxpayer suit.

 As to the ripeness issues, the ripeness doctrine prevents courts from deciding theoretical or abstract questions that do not yet have a concrete impact on the parties.

*Assiniboine and Sioux Tribes v. Board of Oil and Gas Conservation,* 792 F.2d 782, 787 (9th Cir.1986). Because ripeness is peculiarly a question of timing, the court must look "at the facts as they exist today in evaluating whether the controversy before us is sufficiently concrete to warrant our intervention." *Id.* The ripeness inquiry has two prongs: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Winter v. California Medical Review, Inc.,* 900 F.2d 1322, 1325 (9th Cir.1990) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). "The fitness element requires that the issue be primarily legal, need no further factual development, and involve a final agency action." *Dietary Supplemental Coalition, Inc. v. Sullivan,* 978 F.2d 560, 562 (9th Cir.1992). "To meet the hardship requirement, a party must show that withholding judicial review would result in direct and immediate hardship and would entail more than possible financial loss." *Id.*

 Act 359 provides for essentially two actions—both of which are contested here: (1) the Native Hawaiian Vote, and (2) the convening of delegates as "a fair and impartial process to resolve the issues relating to form, structure, and status of Hawaiian self-governance." *See* 1996 Haw.Sess.Laws, Act 140, § 2. Issues as to the legality of the Native Hawaiian Vote are undoubtedly ripe for review.[9] However, claims regarding the convening of delegates are not.

 First, Act 359 makes clear that this convention of delegates will only be triggered if the plebiscite is approved by a majority of ballots cast. *Id.* The results of the Vote

---

8. Articles I § 5 and II § 1 of the Hawaii State Constitution parallel the Fourteenth and Fifteenth Amendments of the United States Constitution respectively. Accordingly, the court will address these claims simultaneously with the federal constitutional claims.

9. At the time of the preliminary injunction hearing, the rules governing the vote, the process of disseminating and collecting the ballots, and the tabulation of the Vote results was already complete. Thus there is no question that HSEC's actions are final and the constitutional issues raised herein are fit for judicial review. *See Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515. Furthermore, because of the temporary injunction on announcement of the Vote results, the court finds that there is a potential for real hardship to the parties and the public at large if the court does not adjudicate this matter immediately.

have yet to be announced.[10] Furthermore, although the Act is somewhat ambiguous, it appears that the legislature has yet to adopt or fund a specific proposal regarding a convention of delegates or any other process to further discuss issues of sovereignty. *See generally,* 1996 Haw.Sess.Laws, Act 140. The court notes that while the Act allows HSEC to provide for an apportionment plan, and to establish the eligibility of convention delegates, the HSEC is still required to submit "a final report of its findings" to the legislature "not less than twenty days prior to the convening of the regular session of 1997." *Id.* at § 4(c). Although HSEC has published its 1995 Report to the Legislature which discusses a timeline after the plebiscite leading up to a central convention, *see* McGregor Opp., Exh. D, at 23–27, the legislature does not appear to have adopted, or agreed to fund, any of the terms of that report.[11] The legislature has made no determination as to the form, substance, or content of the proposed convention of delegates. Thus for purpose of this motion, the court finds that the "convention" is a contingent event whose specifics are unripe for adjudication at this time. *See Lewis v. Continental Bank Corp.,* 494 U.S. 472, 480, 110 S.Ct. 1249, 1255, 108 L.Ed.2d 400 (1990) (principle of ripeness is whether the case entails uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all). The same analysis applies to Plaintiffs' claims of a breach of the trust relationship; these arguments are founded upon undocumented speculation and thus do not set forth a real and substantial controversy for adjudication here.

In short, all that is validly before the court in this motion for preliminary injunction is the Native Hawaiian Vote and related expenditures. The court will defer ruling on issues regarding the convention of delegates until after the Vote results are announced and the

legislature takes further action which potentially implicates constitutional protections.

## B. Fourteenth and Fifteenth Amendment

Kakalia Plaintiffs argue that Act 359 is legislation that impermissibly provides benefits on the basis of race; they advocate a strict scrutiny standard of review here. *See Adarand Constructors, Inc. v. Pena,* —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

Rice also urges strict scrutiny analysis on grounds that Act 359 implicates both a fundamental right to vote and an impermissible racial classification under *Adarand.* Rice contends that excluding non-Native Hawaiian people from participation in the vote is presumptively invalid under the equal protection clause. *See Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) ("*Shaw I*"). He further argues that restricting the vote to Native Hawaiians also implicates the Fifteenth Amendment of the United States Constitution, the Voting Rights Act of 1965, and Article II, Section 1 of the Hawaii State Constitution. He maintains that denial of suffrage on the basis of race violates a fundamental right of citizenship.

In opposition, Defendants rely heavily on *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), and its progeny which establish that preferential legislation for American Indians is based on a political rather than a racial classification and therefore subject to a rational basis test. Defendants argue these cases provide authority for the proposition that Native Hawaiians may be treated separately in matters affecting their own affairs without violating equal protection guarantees. *See Naliielua v. State,* 795 F.Supp. 1009, 1013 (D.Haw.1990), *aff'd,* 940 F.2d 1535 (9th Cir.1991). HSEC Defen-

---

**10.** The court notes that the results were placed under seal immediately after being counted and that the court itself is unaware of the tabulated results.

**11.** HSEC's 1995 Report to the Legislature calls for the preparation of a central convention to draft a constitution and to discuss such issues as levying taxes, regulating commerce, etc. *See* McGregor Opp., Exh. D, at 27–28. The court

notes that Plaintiffs' concerns regarding the constitutionality of the state's involvement in such specific activities may be well-founded. However, as discussed in the text above, these positions are not as yet ripe for adjudication because under the Act, the HSEC has no authority to implement such actions without state funding or approval.

dants also cite a number of federal laws that classify Native Hawaiians as Native Americans thereby implying that Native Hawaiians are "Indians" for purposes of determining the appropriate level of judicial review.

As to the "right to vote" claims, State Defendants contend that the Native Hawaiian Vote is a specialized election and can therefore be limited to members of the group most directly affected. *See Ball v. James*, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981); *Salyer Land Co. v. Tulare Water Dist.*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). State Defendants argue that voter eligibility restrictions in a specialized election, where suffrage is limited to members of a group most directly affected, may withstand constitutional scrutiny. They contend that the Voting Rights Act, 42 U.S.C. § 1973(b), and the principle of one-person, one-vote set forth in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) are not applicable here.

### 1. *Equal Protection*

■ As a general matter, legislation based on racial classifications is constitutionally suspect under the Equal Protection Clause and should be reviewed under strict scrutiny. *See Adarand,* — U.S. at — —, 115 S.Ct. at 2112–13; *Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210, 1214 (5th Cir.1991). In providing that "no state shall deny to any person within its jurisdiction the equal protection of the laws," the Equal Protection Clause of the Fourteenth Amendment establishes personal rights under this Amendment. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989). A group classification such as one based on race is ordinarily subjected to detailed judicial scrutiny to ensure that the personal right to equal protection of the laws has not been infringed. *Adarand,* — U.S. at — — —, 115 S.Ct. at 2112–13. Under this reasoning, even supposedly benign racial classifications must be subject to strict scrutiny. *Id.* at — —, 115 S.Ct. at 2112. According to the Supreme Court, strict scrutiny of all governmental racial classifications is essential:

Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are benign or remedial and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.

*Id.* (quoting *Croson*, 488 U.S. at 493, 109 S.Ct. at 721 (plurality opinion of O'Connor, J.)).

■ There are certain circumstances where seemingly race-conscious legislation such as that affecting aboriginal peoples has been upheld using the less stringent, rational basis test. In *Morton v. Mancari*, 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974), the Supreme Court upheld employment preferences for qualified Indians in the Bureau of Indian Affairs ("BIA") as legislation that was reasonably and rationally designed to further Indian self-government. *Morton*, 417 U.S. at 555, 94 S.Ct. at 2485. The Court reasoned that Congress could justify this differential treatment due to the special relationship the federal government has with Indian tribes, which the Court found to be derived from the separate Constitutional status of Indian tribes under the United States Constitution. *Id.* at 551–54, 94 S.Ct. at 2483–85.

In its equal protection analysis, the *Morton* court held that this preference in hiring and in promoting qualified Indians for the BIA is not a "racial" preference, but rather a political one. *Id.* at 554, 94 S.Ct. at 2484–85. "The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion." *Id.* The Supreme Court has upheld a variety of preferential or separate programs for native

peoples under the rational basis test as set out in *Morton.*[12]

The court is acutely aware of the fact that *Morton* discusses (a) federally recognized tribes, and (b) preferential legislation for these tribes by the *federal* government. The court further acknowledges that *Morton* is premised on the historically unique relationship between the federal government and American Indians, "who are the wards of the nation, dependent upon its protection and good faith." *Carpenter v. Shaw,* 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478 (1930).

On the other hand, the court notes that *Morton* has, at least on one occasion, been applied to the Native Hawaiian situation. *See Naliielua v. State,* 795 F.Supp. 1009, 1013 (D.Haw.1990), *aff'd,* 940 F.2d 1535 (9th Cir.1991). This court's decision in *Naliielua* is authority for the proposition that special legislation for Native Hawaiians, like that for Native Americans, does not necessarily require strict scrutiny analysis. In *Naliielua,* this court held that "the United States' commitment to the native people of this state, demonstrated through the Admission Act and the Hawaiian Homes Commission Act, 1920 ("HHCA"), does not create a suspect classification that offends the constitution." *Id.* The court was convinced that the relationship between the Native Hawaiians as the aboriginal people of the Hawaiian Islands and the State of Hawaii was sufficiently similar to that of American Indians and the United States to bypass the strict scrutiny requirement. The court reasoned that the distinctions between Native Hawaiians and the American Indians [13] were meritless for the purposes of equal protection analysis because "Native Hawaiians are people indigenous to the State of Hawaii, just as American Indians are indigenous to the mainland United States." *Id.*

Although there is a fine line between the political classification of the American Indians in *Morton* and a more heavily scrutinized racial classification discussed in *Adarand,* the court finds that for the purposes of this preliminary injunction, the facts in this case more closely resemble the former. While there is undoubtedly a racial component to the voter qualifications for the Native Hawaiian Vote, the emphasis here is placed on the Native Hawaiian community as one targeted for "rehabilitation" and special consideration by Congress. *See Ahuna v. Dep't of Hawaiian Home Lands,* 64 Haw. 327, 336, 640 P.2d 1161 (1982). The court finds that the State's authority to conduct the Native Hawaiian Vote in this case flows from its fiduciary obligations as the administrator of the HHCA and as trustee of the ceded lands.[14]

---

**12.** *See Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975) (preferential hunting rights for Indians); *Fisher v. District County Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) (adoption laws); *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (immunity from state taxation); *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979) (burden of proof in property disputes); and *Washington v. Washington State Commercial Fishing Vessel Assoc.,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (preferential fishing rights).

**13.** The court also noted that the Ninth Circuit stated in *Pence v. Kleppe,* 529 F.2d 135 (9th Cir.1976), "the word 'Indian' is commonly used in this country to mean 'the aborigines of America.'" *Naliielua,* 795 F.Supp. at 1013.

**14.** When Hawaii was annexed in 1898, the Republic of Hawaii ceded approximately 1.75 million acres of Government and Crown Lands to the United States ("ceded lands"). *See* Melody K. MacKenzie, The Native Hawaiian Rights Handbook 26 (1991).

In the 1920s, Congress enacted the HHCA (Hawaiian Homes Commission Act, 1920, Act of July 9, 1921, 42 Stat. 108, reprinted in 15 Haw.Rev. Stat.Ann. 293 (1988)) and set aside approximately 200,000 acres of those ceded lands for homesteading by Native Hawaiians. *Id.* at 43. Pursuant to the HHCA, the United States assumed a trust obligation to benefit and rehabilitate Native Hawaiians. *Ahuna,* 64 Haw. at 336–37, 640 P.2d 1161. When Hawaii was admitted as a state in 1959, the federal government delegated its authority under the HHCA to the State of Hawaii. *Id.*

In adopting the HHCA as part of its state constitution, Hawaii has agreed that the proceeds and income from Hawaiian home lands shall be used only in accordance with the terms and spirit of the HHCA. *See* Haw. Const.Art. XII, § 1. Under this constitutional provision, the legislature is instructed to set aside funds for "rehabilitation projects to include, but not limited to, educational, economic, political, social, and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved." *Id.*

*Naliielua* provides a suitable framework for analysis here because it addressed legislation benefiting essentially the same group of people that are implicated in .Act 359. Congress enacted HHCA to set aside certain public lands to be considered Hawaiian homelands benefiting the Native Hawaiians; Native Hawaiians are defined in the HHCA as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." *See* HHCA, § 201. Similarly, the right of suffrage in the Native Hawaiian Vote was limited to Native Hawaiians, defined as "any descendent of the indigenous people inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands prior to 1778." *See* Guidelines, attached to State Defendants Opp., Exh. E, § 2–5.

Additionally, the court finds Rice's attempts to distinguish *Morton* unconvincing. The fact that Native Hawaiians are not yet a federally recognized tribe or a quasi-sovereign tribal entity is not determinative here.[15] The Supreme Court has itself applied the rational basis test in reviewing preferential legislation for American Indians not belonging to federally recognized tribes. *See United States v. John*, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978); *Delaware Tribal Business Comm. v. Weeks*, 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977).

Moreover, Congress has clearly indicated that the Native Hawaiians have a special relationship with the United States government that closely parallels that of the American Indians. This is evidenced in part by the fact that Congress has grouped Native Hawaiians together with American Indians for a variety of special benefits programs. Congress has extended to Native Hawaiians the same rights and privileges accorded to Native Indians in a myriad of federal legislation including the Native American Programs Act of 1974 (42 U.S.C. § 2991 *et seq.*), the American Indian Religious Freedom Act of 1978 (42 U.S.C. § 1996), the National Museum of the American Indian Act (20 U.S.C. § 80q *et seq.*), the Native American Graves Protection and Repatriation Act (25 U.S.C. § 3001 *et seq.*), the National Historic Preservation Act (16 U.S.C. § 470 *et seq.*), and the Native American Languages Act (25 U.S.C. § 2901 *et seq.*). Also, in recognition of the special relationship which exists between the United States and the Native Hawaiian people, Congress has enacted numerous special provisions of law for the benefit of Native Hawaiians in the areas of health, education, labor, and housing. *See, e.g.,* the Native Hawaiian Education Act (20 U.S.C. § 7902 *et seq.*), the Native Hawaiian Health Care Improvement Act of 1992 (42 U.S.C. § 11701 *et seq.*), and the HHCA.

Thus while the Native Hawaiians are not now a federally recognized tribe,[16] they nev-

---

Likewise, in 1959 the federal government delegated its authority over all of the ceded lands to the State of Hawaii to hold in public trust for the people of Hawaii. *See* Admission Act, § 5(b). Section 5(f) of the Admission Act provides that part of the proceeds from the .trust lands are to be used "for the betterment of the conditions of native Hawaiians," as defined in the HHCA. *See id.,* § 5(f).

**15.** The court notes that the issue of federal recognition has special significance in the *Morton* case that is not applicable here. Because *Morton* dealt with preferential criteria for BIA jobs, and the BIA only services federally recognized tribes, it makes sense to restrict the job preferences to Indians from federally recognized tribes so that the "employment criterion [is] reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its *constituent groups.*" *Id.* at 554, 94 S.Ct. at 2484–85 (emphasis added).

**16.** The court notes that the Native Hawaiians do not qualify under the traditional means of gain-

ing federal recognition. The administrative procedures to obtain federal recognition as a tribe excludes aboriginal people outside the continental United States. The regulations, codified at 25 Code of Federal Regulations (CFR), part 83 are intended to cover "only those American Indian groups indigenous to the continental United States which are ethnically and culturally identifiable, but which are not currently acknowledged as Indian tribes." 25 C.F.R. § 83.3 (1978). On this basis alone, Native Hawaiians are precluded from applying for federal recognition through the acknowledgement process. *See* Melody K. MacKenzie, Native Hawaiian Rights Handbook 87 (1991). Additionally, Native Hawaiians were not historically organized in tribal-type units and therefore do not fit neatly in the framework set up for American Indians.

. The court is mindful of, and the parties have acknowledged that, it is the exclusive province of Congress to confer federal recognition of tribal status. Only Congress can bestow upon the Native Hawaiians tribal Indian status or "nation-

ertheless have a special relationship with the United States that removes Act 359 from heightened constitutional scrutiny. For the above reasons, and per the instruction in *Morton* and *Naliielua,* the court determines that the rational basis test is appropriate here.[17] The State can satisfy the rational basis in its limited capacity as the appointed guardian of the Hawaiian home lands and as trustee of the public trust created by the federal government in the Admission Act.[18]

■ Under the rational basis test, the State of Hawaii must demonstrate that the Act is rationally related to a legitimate state interest or the state's unique obligation to the Native Hawaiians. *See Morton,* 417 U.S. at 555, 94 S.Ct. at 2485 ("As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgment will not be disturbed."). It is well-established that the State of Hawaii has a unique obligation to the Native Hawaiian population. Under the HHCA, for example, the State of Hawaii has assumed fiduciary duties toward the Native Hawaiians similar to those owed by the federal government to other Native Americans. *See Ahuna,* 64 Haw. at 336–38, 640 P.2d 1161 (extent and nature of the trust obligation of the state toward the Native

Hawaiians may be determined by body of law governing land set aside for the benefit of other Native Americans). Legislative history indicates that the primary purpose of the HHCA was the rehabilitation of Native Hawaiians. *Id.* at 336, 640 P.2d 1161. Rehabilitation was envisioned to include a greater degree of self-determination and self-sufficiency. *Id.; see also,* H.R.Rep. No. 839, 66th Cong., 2d Sess. 4 (1920). Because the United States government delegated these duties to the State of Hawaii upon its admission to the Union, and the state accepted and incorporated such obligations into its constitution, the court finds that the state has a particular and unique interest in Native Hawaiian affairs.[19]

The court pauses here to consider the question asked on the ballots in light of the state's fiduciary duties to the Native Hawaiians under the HHCA. Administration of the HHCA has not been easy: In 1990, fewer than 3800 families actually resided, farmed, or ranched on Hawaiian home lands; 62 percent of the land was used for non-homestead purposes; and over 19,000 Hawaiians were on the list for homestead awards. *See* M. MacKenzie, The Native Hawaiian Rights Handbook, at 43. Furthermore, the court is aware that there are over thirty Native Ha-

hood." The analogy to American Indians here is designed to show that the Native Hawaiians are like American Indians for the purposes of determining the appropriate level of judicial review for this particular Act. That is not to say that the Native Hawaiians are defined as a political group in every instance. There are clearly situations where state or federal action directed at persons of Native Hawaiian ancestry as a racially-defined class would be subject to strict scrutiny. This instance, however, is not one of them.

**17.** Courts have reviewed preferential legislation benefitting the Native Americans under a deferential rational basis test. Congress has passed similar legislation benefitting Native Hawaiians; if the classification of Native Hawaiians is deemed invidious discrimination, over two decades of Congressional legislation regarding this aboriginal group, for all practical purposes, would be effectively nullified. *See Morton,* 417 U.S. at 552, 94 S.Ct. at 2483.

**18.** The court notes that the state's interest in this issue is primarily derived from its power as trustee of the HHCA. Its authority under the public trust created by the Admission Act is more general in scope in that those lands are held in trust for all of the people of Hawaii. Although the

court is not presuming to foretell the possible ramifications of the Vote, the court finds that the state authority to disburse or to fund any event leading to the disbursement of general trust lands is even more limited than its authority to disburse Hawaiian home lands.

**19.** The creation of the Office of Hawaiian Affairs to deal with Hawaiian issues is further evidence of the State's special interest in Hawaiian matters. Also, the state constitution enumerates certain rights reserved for Native Hawaiian peoples. *See, e.g.,* Haw. Const. art. XII, § 7. Moreover, this court recently recognized that the State has special responsibility to protect traditional rights of access to land for subsistence, cultural, and religious purposes. *See Pai 'Ohana v. United States,* 875 F.Supp. 680, 687–88 (D.Haw.1995), *aff'd,* 76 F.3d 280 (9th Cir.1996). From these examples, it is clear then that the State of Hawaii has a special relationship to the Native Hawaiians that does not, and indeed because of the Hawaiian Islands incomparable history and relationship with the United States leading to annexation and eventual statehood, cannot be measured against circumstances in other states.

waiian groups advocating various forms of Native Hawaiian self-governance, some of which involve more autonomous control over the designated home lands. Since the state is charged with the responsibility of administering the HHCA lands to benefit the Native Hawaiian people, the state has a pointed interest in ascertaining the popular Native Hawaiian sentiment on self-governance. As the Hawaiian home lands, having already been set aside for the exclusive benefit of the Native Hawaiian people, would be the most obvious target of any push for sovereignty, the State of Hawaii, as the designated trustee of the lands, has a keen interest in canvassing the opinions of the primary beneficiaries of the HHCA. It is important for the State to be aware of popular sentiment among the beneficiaries of the trust for more effective administration of the trust. The court points out that while the State may have narrow authority to canvass the sentiment of the Native Hawaiians on issues of sovereignty because of its fiduciary obligation to the Native Hawaiians under HHCA, the State cannot take any affirmative action that would run contrary to the interests of other citizens of this State, to whom it also owes exacting trust duties under the public trust created by the Admission Act.

With this backdrop, the court finds that the state's limited interest in polling Native Hawaiians on their views regarding sovereignty is rationally related to, and perhaps even compelling in light of, the state's unique obligation to Native Hawaiians as demonstrated by its constitution and the HHCA. Accordingly, the court finds no equal protection violation in this case.

## 2. *Fundamental Right to Vote*

 Although as a general rule, the Supreme Court requires adherence to the one-person, one-vote principle in elections,[20] there are exceptions for specialized governmental elections that disproportionately impact a particular group.

In *Avery v. Midland County,* the Supreme Court held that the Equal Protection Clause does not "require that the State never distinguish between citizens, but only that the distinctions not be arbitrary or invidious." 390 U.S. 474, 483–84, 88 S.Ct. 1114, 1119–20, 20 L.Ed.2d 45 (1968). The *Avery* Court found that the one-person, one-vote principle applied in the selection of the Midland County Commissioners Court because the commissioners made decisions on how to spend general taxpayer funds that affected the general population at large. *Id.* at 484, 88 S.Ct. at 1120. The Court, however, has reserved any decision on whether the one-person, one-vote principle would apply to "a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents." *Id.* at 483–84, 88 S.Ct. at 1119–20.

Later, the Supreme Court noted that "there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with *Reynolds* . . . might not be required. . . ." *See Ball v. James,* 451 U.S. 355, 363, 101 S.Ct. 1811, 1817, 68 L.Ed.2d 150 (1981) (quoting *Hadley v. Junior College Dist.,* 397 U.S. 50, 56, 90 S.Ct. 791, 795, 25 L.Ed.2d 45 (1970)). *Salyer Land Co. v. Tulare Water Dist.,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) is one of those cases.

In *Salyer Land,* the Supreme Court upheld a California voter qualification statute which restricted voting in an election to choose directors for a water district, based on land-ownership. *Salyer Land,* 410 U.S. at 730–34, 93 S.Ct. at 1230–33. "The franchise is extended to landowners, whether they reside in the district or out of it, and indeed whether or not they are natural persons who would be entitled to vote in a more traditional political election." *Id.* at 730, 93 S.Ct. at 1230. The court was persuaded that the restrictions were constitutional by the fact that the water district had relatively limited

**20.** In *Reynolds v. Sims,* 377 U.S. 533, 566, 84 S.Ct. 1362, 1383–84, 12 L.Ed.2d 506 (1964), the Supreme Court held that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state

legislators. The court determined that in representative elections, the concept of political equality would be undermined unless "as nearly as is practicable one man's vote . . . is to be worth as much as another's." *Id.* at 559, 84 S.Ct. at 1380.

governmental authority; the water district's primary purpose was to provide for the acquisition, storage, and distribution of water for farming in the Tulare Lake Basin, and its actions disproportionately affected landowners. *Id.* at 728–30, 93 S.Ct. at 1229–31. Under those circumstances, the Supreme Court applied a rational basis test and determined that the voter qualification statutes did not violate the Equal Protection Clause. *Id.* at 734–35, 93 S.Ct. at 1232–33.

Similarly in *Ball,* the Supreme Court upheld the constitutionality of an Arizona system for electing directors for an agricultural improvement and power district which limited voter eligibility to landowners and apportioned voting power according to the number of acres owned. *Ball,* 451 U.S. at 367–68, 101 S.Ct. at 1819. The Court held that the District's purpose was sufficiently specialized and narrow and its activities bear on landowners so disproportionately as to release it from the strict demands of the *Reynolds* one-person, one-vote principle. *Id.* at 370–71, 101 S.Ct. at 1820–21.

The similarities between the facts in *Salyer Land, Ball,* and the instant case are unmistakable. Like the governmental authorities in *Salyer Land* and *Ball,* HSEC was created for a specialized purpose and was vested with very limited governmental authority. HSEC's mandate under Act 359 is primarily that of information-gatherer. Recognizing that there was much discourse about Native Hawaiian sovereignty in academic, social, and political circles, the legislature established the HSEC as a barometer to gauge the momentum and direction of popular support for any such movement. While there is undoubtedly some interest and anxiety generated by this issue among non-Native Hawaiian citizens of the State, the fact of the matter is that the State as guardian of the Hawaiian home lands should be able to periodically check the Native Hawaiian pulse. It is obvious that HSEC's actions in conducting the Native Hawaiian Vote disproportionately affect the Native Hawaiian peoples. And as determined in Part I.B.1 above, the Native Hawaiian Vote is reasonably tied to the fulfillment of the State's unique obligations to the Native Hawaiians under the HHCA and the state constitution. Under these facts, Act 359 survives a constitutional challenge to the voting restrictions under the Fifteenth Amendment.[21]

In sum, for the above reasons, the court finds that Plaintiffs are not likely to prevail on their constitutional claims under the Fourteenth and Fifteenth Amendments of the United States Constitution, Articles I, § 5 and II § 1 of the Hawaii State Constitution, or the Voting Rights Act with regards to the Native Hawaiian Vote.[22]

### C. Supremacy Clause

Plaintiffs also contend that Act 359 interferes with an exclusive federal authority to enter into agreements with foreign powers regardless of whether the Hawaiian people are considered a foreign government or an Indian tribe. Plaintiffs argue that if the process initiated by Act 359 (including the Native Hawaiian Vote) results in the formation of a sovereign foreign nation, then the State's involvement constitutes an unauthorized intrusion into the area of foreign affairs. They argue that to the extent that Act 359 establishes a procedure to create a Native Hawaiian government similar to an Indian tribal government it intrudes upon the powers of the federal government to negotiate with native peoples. In support, Plaintiffs cite cases in which the courts have struck down laws that attempt to regulate Indian affairs on preemption grounds.[23]

**21.** Although the analogy to the Americans Indian is not precise here because American Indians are governed by independent tribal governments, the court notes that Native American governments are free to determine their own form of government and are not bound by the one-person, one-vote principle. F. Cohen, Handbook of Federal Indian Law 247 (1982 ed.).

**22.** The Voting Rights Act of 1965 prohibits qualifications to voting based on account of race or color. *See* 42 U.S.C. § 1973. Because the court determined via analogy to the American Indians in *Morton* that Native Hawaiians are not a suspect classification for the purposes of Act 359, the court finds that Plaintiffs are not likely to prevail on their Voting Rights Act claims.

**23.** *See, e.g., Warren Trading Post Co., v. Arizona Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65

**1546**

State Defendants argue that Plaintiffs fail to show that state expenditures of public monies for the Native Hawaiian Vote violate the Supremacy Clause. They contend that Plaintiffs base their claims on a worst case scenario analysis which is insufficient to mount a successful facial challenge of a legislative act. *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987); *Ohio v. Akron Center for Reprod. Health,* 497 U.S. 502, 514, 110 S.Ct. 2972, 2980, 111 L.Ed.2d 405 (1990). They further argue that the preemption argument fails because the State's actions here are not in conflict with federal law or the treaty powers of the United States. Finally, State Defendants argue that the Supremacy Clause does not support the relief sought here. "It only gives priority to federal rights created by federal statute when they conflict with state laws." *See* State Defendants Opp., at 22.

The HSEC Defendants argue that the enactment and execution of Act 359 is in full accord with what they view as a federal policy of reconciliation with the Hawaiian people. They argue that state assistance in promoting self-governance and self-sufficiency by native peoples is commonplace and not necessarily inconsistent with federal protection. *See, e.g., Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 374 (1st Cir.1975). HSEC Defendants, Davianna McGregor; and Kawehi Kanui–Gill also cite the 1993 Apology Bill as support for the legitimacy of the Native Hawaiian Vote, because they contend that this Vote is the State's effort to promote reconciliation as described in the Bill.[24] Furthermore, they argue that the Native Hawaiians have a special relationship with the United States, similar to that of the Native American Indians, which justifies the expenditures in question here. Lastly, HSEC Defendants argue that the cases Plaintiffs cite are not applicable because those cases discuss state laws unwillingly forced upon a native peoples or tribes, and in the instant case, they contend that the State is acting to assist in the self-determination process.

### 1. Facial Challenge

▮ To prevail on a facial challenge of the Act, Plaintiffs must show that Act 359 is altogether unconstitutional.

A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid. The fact that [a legislative Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment.

*United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). In *Salerno,* the Court rejected Respondents' allegations that the Bail Reform Act was unconstitutional on its face because it permitted pretrial detention on the likelihood of future criminal conduct; the Court held that the Bail Reform Act adequately balanced the federal government's compelling interests in public safety against the detainee's liberty interests and therefore was not invalid per se. *Id.*

L.Ed.2d 665 (1980); *Ramah Navajo School Bd., Inc., v. Bureau of Revenue,* 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982); *Segundo v. City of Rancho Mirage,* 813 F.2d 1387 (9th Cir. 1987); *Seneca–Cayuga Tribe v. State Okl. ex. rel. Thompson,* 874 F.2d 709 (10th Cir.1989).

**24.** Defendants' reliance on the 1993 Apology Bill misplaced. While the United States expressed its deep regret to the Native Hawaiian people for the federal government's participation in the overthrow of the Kingdom of Hawaii, and pledged to support reconciliation efforts, that bill did not create any substantive rights. In fact, the disclaimer at the bottom of the Apology Bill

expressly states, that "[n]othing in this joint resolution is intended to serve as a settlement of any claims against the United States." *See* Apology Bill, attached to HSEC Defendants' Opp., Exh. B, at 6. Based on these facts, it is inappropriate for this court to construe the language of the 1993 Apology Bill as affirmative support of the State's actions in this case. The Apology Bill creates no specific Native Hawaiian rights.

Furthermore, contrary to HSEC Defendants' argument, the Apology Bill does not establish a "policy" of reconciliation; it simply pledges U.S. support for such efforts.

In the same vein, the Supreme Court has previously rebuffed a facial challenge on a worst case scenario analysis since the worst case scenario may never occur. *Ohio v. Akron Center for Reprod. Health*, 497 U.S. 502, 514, 110 S.Ct. 2972, 2980, 111 L.Ed.2d 405 (1990). The court found a worst case scenario approach incompatible with the stringent standard of proof required for a valid facial challenge. *Id.*

In their moving papers, Plaintiffs argue, "[a]ssuming the most extreme case, by enacting Act 359 the State of Hawaii has committed itself to a process which may result in the establishment of a foreign nation which exercises exclusive control over all of the lands which currently constitute the public domain of the State." *See* Kakalia Plaintiffs' Motion, at 11. Plaintiffs' argument is based on a sequence of unsupported, forward-looking assumptions: they assume that (a) the results of the Native Hawaiian Vote will favor a convention to discuss sovereignty issues, (b) the ensuing convention of delegates will vote for secession, and (c) the State of Hawaii will subsequently fund a lobbying effort for sovereignty. Although their concerns may in some part be valid, Plaintiffs' claims are based on a scenario that may never occur. Act 359 does not set forth affirmative specific plans for a convention, a lobbying effort, or secession from the Union.[25] Without more, Plaintiffs' speculation about possible constitutional violations are not sufficient to render the Act invalid. *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 480, 110 S.Ct. 1249, 1255, 108 L.Ed.2d 400 (1990). Under the instant facts, the court finds it unlikely that Plaintiffs can mount a successful facial challenge to Act 359 based on the Supremacy Clause of the United States Constitution at this time.

**2. *As Applied Challenge***

To mount a successful challenge to state legislation as applied under the Supremacy Clause,[26] Plaintiffs must show that the legislation is in actual conflict with the substantive operation of a federal program or that it substantively intrudes upon a field that Congress had validly reserved to the federal sphere. *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280–81, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). Federal law can preempt state law in three ways: (1) where Congress expressly preempts state law; (2) where state and federal law actually conflict; or (3) where the federal law is sufficiently comprehensive to infer that Congress left no room for supplementary state regulation. *Id.*

The first two tests for preemption of state law are clearly inapplicable to the instant case. There is no express Congressional intent prescribing the State's actions here, nor has Congress spoken on the issues of plebiscite votes or of conventions discussing self-governance by native peoples. Moreover, at this stage, Act 359 is not fundamentally inconsistent with any federal law or statute. *See* discussion *infra* part I.E. The third test regarding federal occupation of the field, however, requires careful analysis because of precedent set by American Indian law.

The threshold consideration for the federal occupation alternative is whether the subject matter at issue is within the exclusive domain of the federal government: if it is, this clause preempts all state regulations that would vitiate the impact or intent of the federal regulatory scheme; if it is not, a balancing of the federal and state interests is

---

**25.** Without question, any act passed by the State of Hawaii legislature which proposed to grant sovereign status to Native Hawaiians, to transfer land to a new "Nation," to make reparations, or to allow secession from the United States without explicit federal authority would be unconstitutional and void on its face. Any recognition of sovereign status must come from the federal government. *See Price v. State of Hawaii*, 764 F.2d 623, 628 (9th Cir.1985).

**26.** Article VI, Clause 2 of the United States Constitution reads in relevant part:

This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. Article VI delineates the relationship between federal and state authority.

required. *United States v. State of Texas,* 695 F.2d 136 (5th Cir.), *cert. denied,* 464 U.S. 933, 104 S.Ct. 336, 78 L.Ed.2d 305 (1983); *Lockheed Air Terminal, Inc. v. City of Burbank,* 457 F.2d 667 (9th Cir.1972), *aff'd,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973) (state and local laws are preempted if they impinge upon an exclusive federal domain). It is critical to note, however, that "[n]either the Supremacy Clause nor the Plenary Powers Clause bars all state regulation which may touch the activities of the Federal Government." *Hancock v. Train,* 426 U.S. 167, 179–80, 96 S.Ct. 2006, 2012–13, 48 L.Ed.2d 555 (1976).

 Act 359 is state legislation that falls in a gray area as it grazes both federal and state issues. Act 359 touches areas that resemble external affairs, Indian matters, and public land legislation. This court is confronted with the difficult problem of reconciling the broad powers of the State to make laws governing the welfare of its residents and upholding its trust obligations with federal authority over the sovereignty issues at the core of Act 359. To complicate matters, there is no state or federal law directly addressing a state's authority to conduct referenda that could guide the court in its analysis.[27] Much of the analysis turns on whether the court chooses to read Act 359 narrowly on its terms or to consider its broader implications. In either event, the court must determine whether the nature of the subject matter addressed by this Act demands exclusive federal regulation in order to achieve uniformity vital to national interests.

 One avenue where preemption would apply is external/foreign affairs. Governmental power over internal affairs is distributed between the national government and the several states; however, governmental power over external affairs is not distributed, but is vested exclusively in the national government. *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). In *Belmont,* the court held that negotiations, recognition, establishment of diplomatic relations, and acceptance of the assignment and agreements between the United States and the Soviet Union were within the exclusive province of federal authority. *Id.* at 326, 57 S.Ct. at 758–59. The Supreme Court held that New York State laws and policies regarding confiscation could not prevent recovery by the United States of the full amount of a deposit earlier obtained by the Soviet government via a nationalization decree because the international compact between the federal government and the Soviet Union displaced state law. *Id.* at 329, 57 S.Ct. at 760. The Court's ruling was based on the assumption that state laws could not interpose an obstacle to the effective operation of a federal constitutional power in an arena like international affairs where the federal government had exclusive authority. *Id.* at 331, 57 S.Ct. at 761.

Although historically much of the federal government's authority over Indian affairs was derived from the power to conduct foreign affairs, that body of law does not logically apply here. The exclusive authority to recognize nations and conduct foreign policy vested in the United States is not implicated here because by the terms of Act 359 the State is not attempting to deal with a foreign entity. The Act does not provide for any treaty negotiations or for any acts of war or separation from the Union.[28] Moreover, Act 359 is directed solely at the Native Hawaiian population in the United States. For the most part, the Native Hawaiian voters are full citizens of the State of Hawaii and of the United States of America. Act 359 therefore is not a matter of foreign affairs, rather it is state legislation dealing with state citizens.

27. Because of Hawaii's unique history, models from other states do not fit or provide four square precedent.

28. While it is true that there are individuals with the Hawaiian sovereignty movement who advocate secession from the United States, there is no indication that a significant number of Hawaiians, let alone a majority, advocate that model of sovereignty, and no evidence that Act 359 was in any way intended by the state legislature to encourage secession. Indeed, Act 359, by its express provisions, makes no commitment to take any affirmative action based on the Native Hawaiian Vote. Further, as indicated above, the State has no power to grant sovereignty or to authorize secession from the United States.

Under its legislative authority to promote the general welfare, the state may facilitate open forum discussions on issues that are important to its citizens. And under its special relationship to the Native Hawaiians as demonstrated by the HHCA and the Admission Act, the state may justify expenditures targeted specifically for the betterment of the Native Hawaiian people. *See* Admission Act, § 5(f). Thus, the State's involvement in the Native Hawaiian Vote does not intrude upon an exclusively federal power.

Preemption of state laws in Indian country has been consistently recognized as a necessary implication from the federal policy of protecting tribal sovereignty. *See Rice v. Olson,* 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945) ("The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history"). In addition to protecting Indian tribes and tribal territory as set forth in the treaties, the federal government has enacted comprehensive legislation regarding the alienation of tribal property, unfair mercantile practices, and liquor regulation. State laws in those areas therefore have been broadly preempted by the federal regulatory scheme. *See Carpenter v. Shaw,* 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478 (1930) (use, alienation, taxation, and regulation on Indian property); *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965) (controlling trade with Indians in Indian country); *United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) (regulating liquor in Indian country). However, all Indian matters are not under the exclusive domain of federal law. For example, federal law does not generally preempt state laws that are within the tradition purview of state regulation. *See* F. Cohen, Handbook of Federal Indian Law 272 (1982 ed.). Furthermore, many states have historically enacted protective laws for Indians similar in purpose to federal laws despite general federal involvement. *See Joint Tribal Council of the Passamaquoddy Tribe v.*

*Morton,* 528 F.2d 370, 374 (1st Cir.1975) (Maine Constitution provided that the state would assume all the duties and obligations by the Commonwealth towards the Indians in the district of Maine; correspondingly, since its admission as a state, Maine enacted approximately 350 laws relating specifically to the welfare of the Passamaquoddy Tribe). The trust relationship between the federal government and an Indian tribe does not preclude the state from "assum[ing] considerable responsibility for the Tribe's protection and welfare." *Id.* Like other state laws, these are preempted only when they conflict with the purposes of the treaties or with federal law.

Traditional principles of federal preemption of state laws relating to American Indians are only marginally applicable here. Unlike the American Indian situation, the federal government does not have treaty obligations to, or tribal territory for, the Native Hawaiians over which it exercises almost exclusive jurisdiction. The closest analogy would be the HHCA, but that too is distinguishable because the federal government delegated its authority to oversee the Hawaiian home lands to the State of Hawaii upon its admission to the Union.[29] By doing so, the federal government effectively relinquished any rights of primary guardianship over the indigenous peoples of Hawaii. In delegating its trust authority to the state, the federal government turned the traditional principles of federal preemption over the affairs of native peoples on its head.

The state has in effect stepped into the shoes of the federal government in overseeing the Hawaiian home lands. *See Naliielua,* 795 F.Supp. at 1013 n. 4. As the administrator of the Hawaiian home lands program and as trustee of the ceded lands, the State is charged with the traditionally federal responsibility of promoting the general welfare and rehabilitation of the Native Hawaiian people. The State also has the duty to preserve the unique cultural, religious, and subsistence

---

**29.** For 38 years, the United States government served as the sole trustee of Hawaiian home lands for the benefit of Native Hawaiians. When Hawaii was admitted to the Union in 1959, the federal government transferred this primary obligation to the State of Hawaii as a condition of statehood, under a compact that the state accepted and incorporated into its constitution. *See* Admission Act, 1959.

practices of the Native Hawaiians. *See Pai 'Ohana v. United States*, 875 F.Supp. 680, 687–688 (D.Haw.1995), *aff'd*, 76 F.3d 280 (9th Cir.1996). From this unique trust relationship, the court can extrapolate a special State obligation to the Native Hawaiian peoples that explains its interest in this Vote. The sentiment expressed by the Native Hawaiians in the Vote may provide the State guidance in discharging its trust obligations; the State has a strong interest arising from its trustee obligations under HHCA. Because the State's legitimate interest in Native Hawaiian affairs and its efforts to discern the general disposition of the Hawaiian people are consistent with the powers delegated to it by the federal government, the court finds no Supremacy Clause violation here.

### D. First Amendment

The Kakalia Plaintiffs argue that Act 359 violates their First Amendment rights because of the restrictions it places on the sovereignty debate and because, in their view, it substantially impedes Plaintiffs' ability to petition the government for redress. Kakalia Plaintiffs argue that the State has not, and cannot, articulate a compelling interest in regulating the right of Hawaiians to petition the federal government for redress. *See United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967).

State Defendants argue that there is no First Amendment violation here because the State does not (a) directly or indirectly inhibit Plaintiffs' ability to speak in public or redress the federal government, or (b) place any time, place, or manner restrictions on Plaintiffs. *See Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). According to the State Defendants, enjoining the announcement of the Hawaiian Vote would instead abridge the rights of free speech possessed by the Defendants, the Council, and those who have participated in the Vote. *See* State Defendants Opp., at 32.

The HSEC Defendants argue that it is commonplace for governments to spend money on issues in ways that may influence the outcome of public debate; they contend that such programs do not render government involvement constitutionally suspect. *Rust v. Sullivan*, 500 U.S. 173, 193, 111 S.Ct. 1759, 1772, 114 L.Ed.2d 233 (1991). HSEC Defendants further argue that the election process is inclusive of all persons of Hawaiian ancestry and all viewpoints [30] and therefore does not violate the First Amendment.

■ The First Amendment is not a barrier at this juncture both because Plaintiffs' claims are based on speculative events in the future, and because the facts do not support their contention of a First Amendment violation. The free speech claims arising from perceived restrictions on convention delegates are not properly before the court at this time, because the convention will only be held if the plebiscite is approved by a majority of ballots cast. *See* 1996 Haw.Sess.Laws, Act 140, § 2; *see also*, discussion part I.A *supra*.

■ Additionally, the court notes that Act 359 is written in very broad terms and does not impose any content, time, place, or manner restrictions on any voice of opposition. There is nothing in the language of Act 359 or the amending acts that set forth any procedures that could be construed as restrictive of free speech. The court finds no merit to Plaintiffs' argument that the state's information-gathering activities in the form of a plebiscite vote impede Plaintiffs' ability to petition the government for redress. Regardless of whether Plaintiffs cannot or choose not to participate in the Native Hawaiian Vote, the Plaintiffs are not precluded from petitioning the government for redress outside of the state-sponsored forum. For these reasons, the court finds Plaintiffs unlikely to prevail on their First Amendment claims as to the Vote.

---

**30.** HSEC Defendants maintain that "[n]o person of Hawaiian ancestry is excluded from this process. The procedure is designed to be inclusive, and the State's actions are merely facilitative in nature. No options are ruled out, and all views can be considered and debated." HSEC Defendants Opp., at 38.

### E. Trust Relationship

Finally, Plaintiffs contend that Act 359 breaches the fiduciary duty between the State of Hawaii and its citizens. Plaintiffs view the enactment of Act 359 as snowballing into a process which has the intended results of transferring all or a large portion of Hawaiian trust lands to a Native Hawaiian government. They argue that the state is a willing accomplice in a plan to take trust property presently held for all citizens of the State of Hawaii and transferring it to the Native Hawaiians in violation of the State's duty to preserve and protect the trust property for all beneficiaries. They bring this suit under 42 U.S.C. § 1983 to enforce section 5(f) of the Admission Act.

State Defendants correctly argue that Act 359 is not equivalent to establishing a Native Hawaiian government or to committing to a process that will result in transferring all or a large portion of the trust lands to an undetermined Native Hawaiian government. They contend that Act 359 has a very limited purpose which comports with the Admission Act's goal of bettering the conditions of Native Hawaiians.

HSEC Defendants argue that a 42 U.S.C. § 1983 action based on the Admission Act requires special harm that is not plead here. They further argue that HSEC Defendants have qualified immunity from suit here because their actions do not violate "clearly established law." *See Price v. Akaka*, 3 F.3d 1220, 1225 (9th Cir.1993).

The Admission Act granted Hawaii "title to all the public lands and other public property within the boundaries of the State of Hawaii," including the "available lands" set out in the Hawaiian Homes Commission Act. *Id.* at 1222; Admission Act, § 5(b). Hawaii holds these lands as a public trust for five purposes: (1) for the support of public schools and other public educational institutions; (2) for the betterment of the conditions of native Hawaiians; (3) for the development of farm and home ownership; (4) for the making of public improvements; and (5) for the provision of lands for public use. Admission Act, § 5(f). The Admission Act established a right of federal government intervention to protect the trust and an im-plicit cause of action by individual beneficiaries under § 1983. *Keaukaha–Panaewa Community Ass'n v. Hawaiian Homes Comm'n*, 739 F.2d 1467, 1469–72 (9th Cir. 1984).

In *Akaka*, a Native Hawaiian tribal body sued the board of trustees of the Office of Hawaiian Affairs ("OHA") in their individual capacities under 42 U.S.C. § 1983 for commingling, managing, administering, and expending trust funds in violation of the Hawaii Admission Act of 1959. 3 F.3d at 1222–23. The OHA trustees contested the plaintiffs' standing to bring a § 1983 action and also asserted the qualified immunity defense. The Ninth Circuit held that the plaintiffs had standing because they were beneficiaries of the trust, but that plaintiffs could not prevail because the OHA trustees were entitled to qualified immunity. *Id.* at 1225.

■ As an initial matter, the court finds that under Ninth Circuit law, individual beneficiaries can bring a 42 U.S.C. § 1983 action against state officials in their individual capacities to enforce the trust obligation in the Admission Act. *Keaukaha*, 739 F.2d at 1470. As citizens of the State of Hawaii, Plaintiffs are beneficiaries of the trust created by the Admission Act and therefore can sue under 42 U.S.C. § 1983 to enforce the trust obligation. *See Akaka*, 3 F.3d at 1225.

■ Despite having standing to sue, Plaintiffs are not likely to prevail on the merits of their claim that Act 359 violates the Hawaiian trust by providing for a transfer of lands set aside for the benefit of all the citizens of Hawaii for the exclusive use of the Native Hawaiians. Act 359, plainly read, makes no reference to a transfer of land— trust or otherwise—to a sovereign Hawaiian government. Nor does it provide authorization or a mechanism for any such transfer. Furthermore, the court finds that HSEC Defendants may have a legitimate qualified immunity argument because their actions do not appear to violate "clearly established law." *See Akaka*, 3 F.3d at 1225 (referendum on amending definition of Hawaiian ancestry). As such, the court finds that Plaintiffs are not likely to prevail on their § 1983

action regarding alleged violation of the Admission Act.

## II. Irreparable Harm

■ The Kakalia Plaintiffs argue that without a preliminary injunction, additional taxpayer money will be spent which cannot later be recovered from Defendants. They also maintain that announcement of the results of the Native Hawaiian Vote will adversely affect their ability to petition the federal government. Finally, they express concern that the results of the Vote will be misinterpreted as a vote against sovereignty or for a strictly monetary settlement of claims.

Rice argues that without an injunction on a release of the results, he and other qualified members of races restricted from voting will have lost irrevocably the opportunity to exercise their franchise on an issue of immediate and pervasive importance.

In opposition, State Defendants argue that Plaintiffs fail to show either that they will suffer irreparable harm before a decision on the merits can be rendered or that there was a deliberate policy violating Plaintiffs' constitutional rights. The State Defendants argue that the goal here is not to preserve the status quo as if it was static, rather "the better course is to consider directly how best to preserve or create a state of affairs in which effective relief can be awarded to either party at the conclusion of the trial." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* Civil 2d § 2948 (quoting *Developments in the Law–Injunctions,* 78 Harv. L.Rev. 994, 1058 (1965)).

Defendant Kamauu admonishes the court to be wary of judicial intervention into the realm of political questions and speculation on future conduct which may never occur.

In light of the evidence in the record, the court finds Plaintiffs' claims of injury insufficient to warrant a preliminary injunction. First, there is no merit to Plaintiffs' argument that the Act 359 impedes their ability to redress the government on sovereignty issues. The court finds no evidence indicating that the results of the Vote will foreclose

any avenues previously available to Plaintiffs in their effort to redress the government. At this point, all that Act 359 accomplishes is the release of yet another idea into the already vast marketplace of ideas. The court reiterates here that the Vote is designed solely to solicit information, which in and of itself does not threaten an individual's right to free speech.

■ Second, the possibility of some misinterpretation of the Vote results is insufficient injury upon which to base a preliminary injunction. *See* 42 Am.Jur.2d Injunctions § 49 (1969) ("an injury is irreparable within the law of injunctions, where it is of such a character that a fair and reasonable redress cannot be had in a court of law, so that to refuse the injunction would be a denial of justice."). The danger of misinterpretation is inherent in almost any type of referendum vote; without more, these misgivings do not constitute irreparable injury.

Finally, Plaintiffs' concern regarding a waste of taxpayer monies is belated here. Defendants claim to have already spent approximately $2 million of the $2.2 million allocated to them by the State legislature. Act 359 does not provide for the State to expend or appropriate funds beyond this amount. *See* 1994 Haw.Sess.Law, Act 200, § 13. In the larger scheme of state budgetary expenditures, the court finds that expenditure of the remaining $200,000 is hardly an injury of irreparable magnitude.

As for Rice's claims, the court again finds no irreparable injury meriting injunctive relief. Although novel, Rice's argument that his right of suffrage will have been irrevocably lost if the results of the Vote are announced is patently false. As it stands, the Native Hawaiian Vote only polled individuals of Hawaiian descendants as to their views on the issue of Hawaiian self-government. Because it is such a specialized vote, nullification is entirely possible even after the announcement of the results. And should a revote on the issue be necessary, a second election with a presumably broader voter base is plausible. Thus, it is obvious that the court can still preserve the status quo in

which effective relief can be awarded to either party at the conclusion of trial.[31]

In contrast, the public interest in announcement of the results is quite high. This suit was not instigated until the ballots had already been sent out to approximately 85,000 Native Hawaiians around the world. The votes have already been compiled and tabulated, and the public is understandably eager to know the results. Enjoining the announcement of the results at this stage of the Vote would undermine public confidence in the democratic process.

Thus, in accordance with the historical principles of equity and judicial detachment from the political process, the court determines that it is prudent here to refrain from interfering in the announcement of the results of the Native Hawaiian Vote. Plaintiffs' interest in the immediate protection of their constitutional rights is offset by the disruptive effects of injunctive relief and by judicial reluctance to interfere with, coordinate, or subordinate political bodies. After carefully reviewing the facts presented and the parties' arguments, the court finds that Plaintiffs fail to demonstrate a viable combination of a likelihood of success on the merits and irreparable harm to merit injunctive relief. Accordingly, the court DENIES Plaintiffs' Motion for a Preliminary Injunction.

### CONCLUSION

For the reasons stated above, the court DENIES Plaintiffs' Motion for Preliminary Injunction. The court will however stay the effect of its order until Monday, September 9, 1996 at 11 A.M. Hawaii Standard Time to allow the Plaintiffs an opportunity to appeal this order to the Ninth Circuit Court of Appeals on an emergency basis if they so desire. Unless the Ninth Circuit rules to the contrary, the court will order that the ballots be unsealed, and the HSEC be allowed to announce the results of the Native Hawaiian Vote as of 11:01 A.M., September 9, 1996.

IT IS SO ORDERED.

---

**31.** At the temporary restraining order hearing, Plaintiffs argued that injunctive relief was critical because once the results of the Vote are out, the court "cannot put the toothpaste back in the tube." Having looked carefully at the facts, the court disagrees with Plaintiffs' assessment of the harm. The court does not need to "put the toothpaste back into the tube" to provide Plaintiffs an adequate remedy in this case. On one hand, Plaintiffs are correct that once the results of the Vote are announced, the court will be hard pressed to turn back the clock and act as if no vote had taken place. On the other hand, the court cannot turn the clock back and act as if the Vote never happened either. The court points out that voting was already completed at the time of the hearing for the temporary restraining order. As such, the public interest in tabulating and disclosing the results of the Vote is relatively high. The public interest in the Vote results predominates here because their interests are most vulnerable. An injunction is not required because announcement of the results does not in any way impede the court's ability to rule on the constitutionality or enjoin any future conduct based on the Vote.