Nui Loa PRICE, Dr., aka Maui Loa, individually and in his capacity as chief of the Hou Hawaiians; The Hou Hawaiians, a native Hawaiian Ohana; Kamuela Price, individually and in his capacity as member of elder council of the Hou Hawaiians, Plaintiffs–Appellees,

v.

Moanikeala AKAKA; Rod Burgess; Clarence Ching; Frenchy DeSoto; Louise Hao; Manu Kahaialii; Thomas Kalukukui, Sr.; Moses Keale, Sr.; and Kevin Mahoe, Defendants–Appellants.

No. 92–16462.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 5, 1993.

Decided Aug. 23, 1993.

As Amended Nov. 2, 1993.

Kamuela Price, Haleiwa, HI, pro se.

Walter R. Schoettle, Honolulu, HI, for plaintiffs-appellees.

Steven S. Michaels, Deputy Atty. Gen., Honolulu, HI, for defendants-appellants.

Before: GOODWIN, TANG and NOONAN, Circuit Judges.

TANG, Circuit Judge:

Dr. Nui Loa Price, Kamuela Price, and the Hou Hawaiians, a native Hawaiian tribal body, (collectively, "Price") sued the board of trustees ("trustees") for the Office of Hawaiian Affairs ("OHA") in their individual capacities under 42 U.S.C. § 1983 for commingling, managing, administering, and expending trust funds in violation of the Hawaii Admission Act of 1959, Pub.L. No. 86–3, 73 Stat. 4 ("Admission Act"). The trustees moved for judgment on the grounds of qualified or absolute immunity. The motion was granted in part and denied in part. The trustees brought this interlocutory appeal challenging the partial denial of immunity. The trustees argue that they are entitled to immunity for using trust funds for a referendum on whether the definition of "native Hawaiian" should be amended to include all people of Hawaiian ancestry and not just those with 50% or more Hawaiian blood (the "Single Definition Referendum"). The trustees additionally contest the district court's determination that Price has standing to bring a § 1983 claim based on the Admission Act. We affirm in part and reverse in part.

*Historical Background*

In 1959, Congress admitted Hawaii into the Union and "declared [Hawaii] to be a State of the United States of America." Admission Act. In return, Hawaii made a compact with the United States to adopt the "Hawaiian Homes Commission Act, 1920," Pub.L. No. 34, ch. 42, 42 Stat. 108 (1921) ("HHCA"), as part of its state constitution.

*Id.* § 4. Under the HHCA, some 200,000 acres of land designated as "available lands" were to be leased to native Hawaiians at a nominal rate for 99 years. The HHCA defines "native Hawaiian" as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." HHCA § 201.[1]

Section 5(b) of the Admission Act granted Hawaii "title to all the public lands and other public property within the boundaries of the State of Hawaii," including the "available lands" set out in the HHCA, (hereinafter "§ 5(b) lands"). *See Price v. Akaka*, 928 F.2d·824, 826 n. 1 (9th Cir.1990) (*"Akaka I"*), *cert. denied,* — U.S. ——, 112 S.Ct. 436, 116 L.Ed.2d 455 (1991). Hawaii holds these § 5(b) lands as a public trust for five purposes: (1) for the support of public schools and other public educational institutions; (2) for the betterment of the conditions of native Hawaiians; (3) for the development of farm and home ownership; (4) for the making of public improvements; and (5) for the provision of lands for public use. Admission Act § 5(f).[2]

In accordance with the Admission Act, Hawaii amended its constitution and declared that "[t]he lands granted to the State of Hawaii by Section 5(b) of the Admission Act ... excluding therefrom lands defined as 'available lands' by ... the [HHCA] ... shall be held by the State as a public trust for native Hawaiians and the general public." Haw. Const. art. XII, § 4. The OHA was charged with the responsibility of administering and managing the trust proceeds. Hawaii then enacted Chapter 10 of the Hawaii Revised Statutes ("H.R.S.") to fund the OHA. Under H.R.S. §§ 10–13.5 and 10–3,

the OHA is funded in part with twenty percent of all income derived from the § 5(f) public trust. As to this transfer, we held that:

> Transferring a portion of the § 5(f) trust income to a state agency ... [does] not dissolve or dilute the restrictions on how that income may be spent. So long as § 5(f) trust income remained in the hands of the state, as it did when transferred from the § 5(f) corpus to the OHA corpus, the § 5(f) obligations applied. Naturally, we accept that once the income has been "disposed of" or "use[d]" by the state, there are no § 5(f) limitations on subsequent use; however, we reject the trustees' suggestion that Hawaii "disposed of" or "used" § 5(f) trust income simply by transferring it to the OHA. Admission Act § 5(f). Because the funds are still in state hands, § 5(f)'s restrictions apply to the use or disposal of the income *by* OHA.

*Akaka I,* 928 F.2d at 827.

Thus, the issue here is whether the trustees breached their fiduciary duties under the Admission Act by expending trust funds for purposes other than those set out in § 5(f).[3]

### *Factual Background*

The OHA trustees proposed a "Single Definition Referendum" to native Hawaiians and Hawaiians, concerning whether the definition of native Hawaiians should be amended to include all people of Hawaiian ancestry and not just those with 50% or more Hawaiian blood. The trustees believed that "adoption of a single definition would better the condition of native Hawaiians, in that the blood quantum requirement had long been recognized as the single most divisive issue in the Hawaiian community." The trustees used § 5(f) funds for mailing out and distributing the nonbinding Referendum ballots.

In response, Price filed a complaint under 42 U.S.C. § 1983 against the trustees in their

---

**1.** Unless otherwise stated, the term "native Hawaiian" shall be used as defined by the Hawaii Homes Commission Act.

**2.** Although the § 5(b) lands include the "available lands" under the HHCA, § 4 of the Admission Act "strictly limits the manner in which Hawaii may manage the homelands and the income they produce." *Price v. Akaka,* 928 F.2d 824, 826 n. 1 (9th Cir.1990) (*"Akaka I"*), *cert. denied,* — U.S. ——, 112 S.Ct. 436, 116 L.Ed.2d 455 (1991).

**3.** Whether the trustees breached their fiduciary duties under Chapter 10 of the H.R.S. is a matter of state law which we do not reach. *See Price v. State of Hawaii,* 921 F.2d 950, 956 (9th Cir.1990) (*"Price II"*) ("it is not [the federal court's] function to attempt to seek out conflicts between the enactments of the State and section 5(f) of the Act").

individual capacities challenging this expenditure of § 5(f) funds. The complaint alleged that the trustees: (1) wrongfully commingled § 5(f) funds with other OHA funds; (2) failed to manage and administer the trust in accordance with Congress' purposes and in particular for the benefit of native Hawaiians; (3) expended § 5(f) funds for purposes contrary to § 5(f) of the Admission Act; and (4) expended § 5(f) funds for the benefit of non-native Hawaiians who are not beneficiaries under § 5(f) of the Admission Act.

The trustees moved to dismiss the action. The district court granted the motion holding that "the complaint failed to state a claim because the Admission Act did not impose the obligations which plaintiffs assert were violated, and because the suit was against defendants in their official capacities and therefore barred by the Eleventh Amendment."

On appeal, we held that because Price alleged that the trustees expended § 5(f) funds in contravention of the Admission Act he stated a federal claim enforceable under 42 U.S.C. § 1983. *Akaka I*, 928 F.2d at 827–28. We further held that because Price is suing the trustees in their individual capacities the Eleventh Amendment does not apply, *id.* at 828, and reversed and remanded the case to the district court, *id.* at 829.

On remand, the district court ruled that the trustees were entitled to qualified immunity with regard to the claim that they improperly commingled and used § 5(f) funds to pay for the OHA's operating expenses.[4] The district court, however, denied the trustees immunity as to the claims that the trustees managed, administered, and expended § 5(f) funds for the Single Definition Referendum, in violation of the Admission Act. The district court then granted the trustees' motion for a stay pending this interlocutory appeal.

## I. *Standing to bring a § 1983 cause of action*

Before proceeding to address the question raised on this interlocutory appeal, we must determine whether there is standing. *City*

of *South Lake Tahoe v. California Tahoe*, 625 F.2d 231, 233 (9th Cir.) (citation omitted) ("Standing is a necessary element of federal-court jurisdiction."), *cert. denied*, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980). Therefore, as a threshold issue, we first turn to the trustees' contention that Price lacks standing to bring a § 1983 cause of action based on the Admission Act. The issue is two-fold: (1) whether Price has standing; and (2) whether Price may bring a § 1983 cause of action based on the Admission Act.

### A.

The trustees argue that Price does not have standing because of the Supreme Court's rationale in *Lujan v. Defenders of Wildlife*, — U.S. —, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). We disagree. *Lujan* involved a challenge to a new regulation interpreting § 7 of the Endangered Species Act of 1973 ("ESA") to apply only within the United States or on the high seas. Specifically, plaintiffs filed an "action against the Secretary of the Interior, seeking a declaratory judgment that the new regulation is in error as to the geographic scope of § 7(a)(2), and an injunction requiring the Secretary to promulgate a new regulation restoring the initial interpretation." *Id.* at —, 112 S.Ct. at 2135. The Court found plaintiffs failed to show standing to enforce the ESA.

The Court set out a three-part test and stated that a plaintiff has standing if: (1) plaintiff suffered an "actual or imminent" injury; (2) there is a "causal connection between the injury and the conduct complained of;" and (3) that injury will likely be "redressed by a favorable decision." *Id.* at —, 112 S.Ct. at 2136. Whether a plaintiff is the object of the action at issue will affect the standing analysis:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little

4. The parties do not appeal this decision.

question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed.

*Id.* at ——, 112 S.Ct. at 2137.

The Court determined that it was dealing with the latter situation. It then applied the standing requirements strictly where a "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,"* —— U.S. at ——, 112 S.Ct. at 2137.

The present case, unlike *Lujan,* does not involve a suit against government for promulgating an unlawful regulation or for failing to promulgate a regulation. Rather, Price is among the class of § 5(f) beneficiaries whose welfare is the object of the action at issue. Therefore, there is "little question that the [trustees'] action or inaction has caused him injury, and that a judgment preventing or requiring action will redress it." *Id.*[5] Moreover, we have held that "Price, as a native Hawaiian, has standing to seek redress for past violations of § 5(f)." *Akaka I,* 928 F.2d at 827 n. 2. The Supreme Court's rationale in *Lujan* does not compel a different result. Price has standing.

### B.

██ In light of the Supreme Court's recent decision in *Suter v. Artist M.,* —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the trustees argue that § 1983 claims based on the Admission Act simply cannot be brought. This argument fails unless *Suter* overruled our prior decision in *Keaukaha–Panaewa Community Ass'n v. Hawaiian Homes Comm'n,* 739 F.2d 1467, 1472 (1984) (*"Keaukaha II "*), where we held that a § 1983 cause of action may be brought under the Admission Act.

The issue in *Suter* was "whether private individuals have the right to enforce by suit a provision of the Adoption Assistance and Child Welfare Act of 1980 (Adoption Act or Act) either under the Act itself or through an action under 42 U.S.C. § 1983." —— U.S. at ——, 112 S.Ct. at 1363 (citation and footnote omitted). As to the § 1983 issue, the *Suter* Court stated:

In *Maine v. Thiboutot,* 448 U.S. 1 [100 S.Ct. 2502, 65 L.Ed.2d 555] (1980), we first established that § 1983 is available as a remedy for violations of federal statutes as well as for constitutional violations. We have subsequently recognized that § 1983 is not available to enforce a violation of a federal statute "where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983."

*Id.* at ——, 112 S.Ct. at 1366 (parallel citations omitted) (quotation omitted). The Court then stated that "[s]ection 1983 speaks in terms of 'rights, privileges, or immunities,' not violations of federal law," *id.* at ——, 112 S.Ct. at 1367 (quotation omitted), and concluded that the Adoption Act does not create a federally enforceable right under § 1983. *Id.* at ——, 112 S.Ct. at 1370.

The trustees argue that, as in *Suter,* § 1983 claims may not be brought to challenge violations of the Admission Act because the Admission Act does not create a federally enforceable right. We disagree. The instant case involves a public trust,[6] and under basic trust law principles, beneficiaries have the right to "maintain a suit (a) to compel the trustee to perform his duties as trustee; (b) to enjoin the trustee from committing a breach of trust; [and] (c) to compel the trustee to redress a breach of trust." Restatement 2d of the Law of Trusts, § 199; *see also id.* at § 200, comment a ("Normally a suit against a trustee to enforce the trust or to enjoin or obtain redress for a breach of

---

**5.** Previously, we stated that "Price, as a native Hawaiian, has standing to seek redress for past violations of § 5(f) even though that redress may not necessarily benefit native Hawaiians." *Akaka I,* 928 F.2d at 827 n. 2.

**6.** As stated before, under the Admission Act, the United States and Hawaii entered into a compact whereby the United States granted Hawaii title to all § 5(b) lands and Hawaii agreed to hold the § 5(b) lands as a public trust. Hawaii Admission Act of 1959, Pub.L. No. 86–3, 73 Stat. 4, §§ 4 and 5.

trust is brought by a beneficiary."). We have accordingly held that "allowing Price to enforce § 5(f) is consistent with the common law of trusts, in which one whose status as a beneficiary depends upon the discretion of the trustee nevertheless may sue to compel the trustee to abide by the terms of the trust." *Akaka I,* 928 F.2d at 826–27.

Our decisions in *Keaukaha II,* 739 F.2d at 1472, and *Akaka I,* 928 F.2d at 828, holding that beneficiaries of the public trust created by Congress may bring a § 1983 claim are consistent with the Supreme Court's decision in *Suter.* Congress enacted the Admission Act, a federal public trust, which by its nature creates a federally enforceable right for its beneficiaries to maintain an action against the trustee in breach of the trust. As a beneficiary, Price may therefore bring a § 1983 action under the Hawaii Admission Act against the trustees.

## II. *Qualified Immunity*

■ As the Supreme Court stated in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738 (citations omitted). In ruling that the trustees' use of § 5(f) monies to fund the Single Definition Referendum violated clearly established law, the district court stated:

First, § 5(f) provides for management and disposition of the funds in accordance with the five purposes set forth therein "in such manner as the constitution and laws of said State may provide." In accordance with this directive, the State in establishing OHA, statutorily provided that the public trust funds appropriated to OHA could *only* be used for the benefit of native Hawaiians.

Further, the Attorney General opinion issued in 1983 unequivocally advised OHA that the Hawaii legislature could not authorize the use of § 5(f) funds to better the conditions of Hawaiians. Accordingly, this court finds that the contours of the law in 1988 was "sufficiently clear that a reasonable official would understand that what he was doing violates that right." Therefore, if § 5(f) funds were used to advance the single definition referendum, defendants would not be entitled to qualified immunity for their actions.

(Emphasis added) (internal citation and quotation omitted).

■ First of all, an Attorney General's opinion cannot by itself establish "clearly established law." *See Cedar Shake and Shingle Bureau v. City of Los Angeles,* 997 F.2d 620, 625 (9th Cir.1993) (the courts are not bound by an Attorney General's opinions, although they are generally regarded as highly persuasive); *Price II,* 921 F.2d at 957 (the Attorney General's opinion regarding the use of § 5(f) funds in the hands of OHA had no affect on the court's analysis); *Guardian Plans, Inc. v. Teague,* 870 F.2d 123, 129 (4th Cir.) (Attorney General's opinion "does not have the force of law"), *cert. denied,* 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 172 (1989); *Nicholson v. Gant,* 816 F.2d 591, 595 (11th Cir.1987) (The Attorney General's opinion "is not law and not binding").

Secondly, there is no clearly established law prohibiting the OHA trustees from expending § 5(f) funds in support of the Single Definition Referendum which questioned the 50% or more blood quantum requirement for native Hawaiian status. The restriction of section 5(f), incorporating the HHCA definition and confining the "betterment" purpose [7] of the lands trust funds to those of 50% or

---

**7.** Section 5(f) of the Admission Act states that the § 5(b) lands "shall be held by [Hawaii] as a public trust for the support of the public schools and other public educational institutions, for the *betterment of the conditions of native Hawaiians,* ..., for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and for the

provision of lands for public use." (Emphasis added). *See also Price v. State of Hawaii,* 764 F.2d 623, 625 (9th Cir.1985) (*"Price I"*) ("Proceeds from the section 5(f) trust are to be devoted to 'one or more' of five statutory purposes, one of which is 'for the betterment of the conditions of native Hawaiians.' "), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 771 (1986).

more blood, remains in place as governing federal law.[8] *See Hoohuli v. Ariyoshi,* 630 F.Supp. 1153, 1160 n. 31 (D.Haw.1986). While actually changing the definition of native Hawaiian contained in the HHCA, or the administration of OHA programs in conformance with a revised definition, would violate clearly established federal law, the Referendum did not do so. The OHA trustees reasonably believed that a referendum to determine Hawaiian opinion on the proper definition of "native Hawaiian" was for the "betterment of the conditions of native Hawaiians" as presently defined. *See Hoohuli,* 631 F.Supp. at 1161 (evidence showed "that the rationale for defining 'native Hawaiian' in the HHCA in 1920 had become outmoded" and that "defining 'Hawaiian' to include all people of aboriginal blood could help alleviate divisiveness in the Hawaiian community resulting from blood quantum restrictions"); *Kepo'o v. Burgess,* No. 88-2987-09 (Haw. 1st Cir.1988) (In an order denying a motion for preliminary injunction, Judge Milks found that there was no evidence that the Single Definition Referendum would not be for the betterment of conditions of native Hawaiians and that such Referendum is "one of many ways to achieve the betterment of the conditions of native Hawaiians even though all Hawaiians would benefit.")[9].

Moreover, in 1978, the Hawaii legislature directed the OHA to address the issue of whether the blood quantum requirement should be amended. *See* Stand.Comm.Rep. No. 59, Hawaii Constitutional Convention of 1978, Vol. I, at 644 ("Although your Committee was tempted to change this outmoded [blood quantum] rule from the 1920s, your Committee concluded that this responsibility should be assumed by the Office of Hawaiian Affairs.").

Thus, the OHA trustees were entitled to qualified immunity as to Price's claims that they violated the Admission Act by improperly managing, administering, and expending § 5(f) funds for the Single Definition Referendum.[10]

## CONCLUSION

We AFFIRM the district court's determination that Price has standing to bring a § 1983 cause of action based on the Admission Act and REVERSE the district court's ruling that the trustees were not entitled to qualified immunity.

AFFIRMED in part, and REVERSED in part.

---

**8.** Also remaining in place are the restrictions placed by section 4 of the Admission Act on the "homelands," which are not part of the trust administered by the OHA. *See Price I,* 928 F.2d at 826 n. 1.

**9.** The case ultimately was affirmed in a memorandum decision by the Hawaii Supreme Court, No. 88–2987 (1991).

**10.** Because we find that trustees are entitled to qualified immunity we do not reach the question of whether the trustees are also entitled to absolute immunity.

