**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VIRGIL E. DAY; MEL
HOOMANAWANUI; JOSIAH L.
HOOHULI; PATRICK L.
KAHAWAIOLAA; SAMUEL L.
KEALOHA, JR.,
        *Plaintiffs-Appellants,*

v.

HAUNANI APOLIONA, individually
and in her official capacity as
Chairperson and Trustee of the
Office of Hawaiian affairs;
ROWENA AKANA; DANTE
CARPENTER; DONALD CATALUNA;
LINDA KEAWE'EHU DELA CRUZ;
COLETTE Y. PI'IPI MACHADO; BOYD
P. MOSSMAN; OSWALD K. STENDER;
JOHN D. WAIHEE, IV, Trustees of
the Office of Hawaiian Affairs of
the State of Hawaii, sued in their
official capacities for declaratory
and prospective injunctive relief;
sued in individual capacities for
damages; CLAYTON HEE; CHARLES
OTA, Former Trustees of the
Office of Hawaiian Affairs of the
State of Hawaii, sued in their
individual capacities for damages,
        *Defendants-Appellees.*

No. 06-16625

D.C. No.
CV-05-00649-SOM

OPINION

Appeal from the United States District Court
for the District of Hawaii
Susan Oki Mollway, District Judge, Presiding

9425

Argued and Submitted
June 5, 2007—Honolulu, Hawaii

Filed August 7, 2007

Before: David R. Thompson, Marsha S. Berzon, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Berzon

## COUNSEL

Walter R. Schoettle, Honolulu, Hawaii, for the plaintiffs-appellants.

Robert G. Klein, Honolulu, Hawaii, for defendants-appellees Apoliona, et al.

Charleen M. Aina, Deputy Attorney General, Honolulu, Hawaii, for defendants-appellees Hee and Ota.

William J. Wynhoff, Deputy Attorney General, Honolulu, Hawaii, for amicus curiae, State of Hawaii.

## OPINION

BERZON, Circuit Judge:

The Hawaii Admission Act, Pub. L. No. 86-3, 73 Stat. 4 (1959) ("Admission Act") granted Hawaii title to most of the federal government's public land within the state, *id.* at § 5(b)-(e), 73 Stat. at 5-6, and required the state to hold that land and profits from it in "public trust" for five purposes, *id.* at § 5(f), 73 Stat. at 6. One such purpose is "for the betterment of the conditions of Native Hawaiians." *Id.* The other purposes — for public schools, development of farm and home ownership, public improvements, and the provision of land for public use — are not limited to Native Hawaiians. *Id.*

The plaintiffs in this case, whom we call "Day" after the first-named of them, are Native Hawaiians, defined under federal law as "descendant[s] of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." Hawaiian Homes Commission Act, Pub. L. No. 67-34, 42 Stat. 108 (1921) ("HHCA"); *see generally Rice v. Cayetano*, 528 U.S. 495, 507 (2000).[1] Based on the Admission Act

---

[1] Hawaii state law similarly defines the term "Native Hawaiians." Hawaii separately defines the term "Hawaiians" as any descendants —

and state law, these Native Hawaiians contend that the defendants, current and former trustees of the state's Office of Hawaiian Affairs ("OHA"), have not properly considered ethnic distinctions in spending the assets of the Admission Act trust ("§ 5(f) trust"). To enforce their asserted right to ensure that the § 5(f) trust funds are spent in accordance with the Admission Act's specifications, Day filed suit under 42 U.S.C. § 1983.

A considerable line of precedent in this circuit holds that Native Hawaiians, as beneficiaries of the § 5(f) trust, have a right under the Admission Act that is enforceable by § 1983. The district court, however, held to the contrary, taking the view that recent Supreme Court cases have so undermined our prior case law that suits like this one may no longer be maintained. After a careful comparison of our prior cases with the recent Supreme Court § 1983 cases on which the district court relied, we cannot agree that there is a conflict sufficient to justify a district court or a three-judge panel of this court disregarding well-established precedent. We therefore reverse the district court's dismissal of the case and, without expressing any opinion of the merits of Day's allegations, remand for further proceedings.[2]

---

regardless of exact ancestry or "blood" quantum — of certain aboriginal peoples inhabiting the Hawaiian Islands in 1778. Haw. Rev. Stat. § 10-2. We use the terms "Native Hawaiian" and "Hawaiian" as they are defined in federal and state law, respectively.

[2]No standing issue has been raised. We do, of course, have an obligation to consider Article III standing independently, as we lack jurisdiction when there is no standing. *See Bernhardt v. County of L.A.*, 279 F.3d 862, 868 (9th Cir. 2002). Day's allegations, however, are analogous to those in *Price v. Hawaii*, 764 F.2d 623 (9th Cir. 1985), in which we concluded that Native Hawaiians alleging a breach of the § 5(f) trust for failure to spend funds for the betterment of Native Hawaiians had standing to do so. *Id.* at 630; *see also Price v. Akaka*, 928 F.2d 824, 826-27 (9th Cir. 1991) ("*Akaka I*"). We are bound by the two *Price* cases on the standing issue, and so do not consider the matter further.

## I.  PROCEDURAL HISTORY

State law assigns to the OHA the promotion of "[t]he betterment of conditions of Native Hawaiians . . . [and] Hawaiians." Haw. Rev. Stat. § 10-3. To effectuate this assignment, OHA receives a portion of the § 5(f) trust monies, which it is to devote "to the betterment of the conditions of Native Hawaiians," *id.* at § 10-3(1).[3] The agency receives other funds as well, which it uses to fund projects that do not meet the § 5(f) restrictions. *See generally Rice,* 528 U.S. at 508-09.

In this case, Day alleges that OHA misspent § 5(f) trust funds in two ways: (1) by lobbying in favor of a federal bill (the "Akaka Bill") "that purports to create a Native Hawaiian Governing Entity to be established by persons . . . without regard to the blood quantum requirements set out under HHCA,"[4] and (2) by supporting three social service programs whose "funds are not subject to the limitation that they may

---

[3]The § 5 grant included approximately "200,000 acres [formerly] set aside [as "Hawaiian homelands" to benefit Native Hawaiians] under the Hawaiian Homes Commission Act and almost 1.2 million additional acres of land." *Rice*, 528 U.S. at 507. OHA receives twenty percent of the revenue from the 1.2 million additional acres. Haw. Rev. Stat. § 10-13.5. A different agency, the Department of Hawaiian Home Lands, administers the 200,000 acres that were set aside by the HHCA. Haw. Rev. Stat. § 26-17; *see generally Rice,* 528 U.S. at 509. We have not previously decided whether the HHCA lands may be used for the purposes specified in § 5(f) or only for the more restricted uses specified in the HHCA. *See* Admission Act § 4, 73 Stat. at 5; *Keaukaha-Panaewa Cmty. Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216, 1218-19 & n.2 (9th Cir. 1979) ("*Keaukaha I*"); *see also Akaka I*, 928 F.2d at 826 n.1 ("A 'compact' between Hawaii and the United States strictly limits the manner in which Hawaii may manage the homelands and the income they produce."). We do not decide that question today either, as Day challenges only the use of funds managed by the OHA.

[4]The complaint, first filed in 2005, refers to the Native Hawaiian Government Reorganization Act of 2005, S. 147, 109th Cong. (2005). In the current Congress, a largely identical bill has been introduced as the Native Hawaiian Government Reorganization Act of 2007, S. 310/H.R. 505, 110th Cong. (2007).

be expended only for the betterment of the conditions of 'native Hawaiians.' "[5] Such expenditures, the amended complaint alleges, are inconsistent with the purposes listed in § 5(f) and constitute a violation of (1) the Admissions Act and the HHCA, enforceable by 42 U.S.C. § 1983; (2) the Equal Protection Clause of the Fourteenth Amendment; and (3) a state common law statutory duty of fidelity, *see* Haw. Rev. Stat. § 10-16(c)). Day seeks an accounting; monetary, injunctive, and declaratory relief; and attorneys' fees.

The district court *sua sponte* dismissed the amended complaint. Ruling on an argument raised not by the defendants but by the state of Hawaii in an amicus curiae brief, the court held that the complaint failed to allege any Admission Act violation enforceable under § 1983. The court additionally concluded that the Equal Protection allegations failed to state a claim and dismissed the state law claims as a matter of discretion. *See* 28 U.S.C. § 1367(c)).

Day does not contest the dismissal of his Equal Protection claims or the discretionary dismissal of the state claims. He also does not contest the dismissal of all claims against the two defendants, Clayton Hee and Charles Ota, who are former rather than current trustees.[6] We thus consider only whether

---

[5]The three social service programs named in the complaint are the Native Hawaiian Legal Corporation, the Na Pua No'eau Education Program, and Alu Like, Inc. In their motions for summary judgment before the district court, the parties submitted a substantial amount of information about the activities of these programs and the grants they received from OHA. As we do not rule on those motions, the additional facts — disputed or not — are irrelevant to this appeal.

[6]Before dismissing the amended complaint, the district court granted summary judgment in favor of the former trustees on the basis of the § 1983 statute of limitations. The court allowed Day to amend the complaint to address the issue, however, and defendants Hee and Ota were again named in the amended complaint. As noted, the dismissal of the claims against Hee and Ota is no longer contested. We affirm the dismissal of the complaint as to those defendants.

Day's Admission Act cause of action against the remaining defendants, all current trustees, rests on a right enforceable under § 1983.

Dismissal of a § 1983 claim for the lack of an enforceable right amounts to dismissal for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 950-51 (9th Cir. 1999); *United States v. Stanley*, 483 U.S. 669, 691 n.7 (1987). We review such a dismissal *de novo*. *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).[7]

## II.   ANALYSIS

The question in this case, whether a violation of § 5(f) of the Admission Act is enforceable via § 1983, is not new to this court. Over the last two decades, we have established the broad contours of Native Hawaiians' right to sue for breach of the state's § 5(f) trust obligations and held that § 5(f) does not create an implied private right of action for breach of the § 5(f) trust, *see Keaukaha I*, 588 F.2d 1216, but does create a right enforceable via 42 U.S.C. § 1983, *see Price v. Akaka*, 3 F.3d 1220 (9th Cir. 1993) ("*Akaka II*"); *Keaukaha-Panaewa Cmty. Ass'n v. Hawaiian Homes Comm'n*, 739 F.2d 1467 (9th

---

[7]On appeal, as before the district court, the defendants take no position with regard to the § 1983 right because, as their attorney explained at oral argument, doing so could present the defendants, as trustees, with a conflict with the Native Hawaiians whose interests they have a fiduciary obligation to forward. The state, as amicus, alone argues that the complaint was properly dismissed. "Generally, we do not consider on appeal an issue raised only by an amicus." *United States v. Gementera*, 379 F.3d 596, 607 (9th Cir. 2004) (quoting *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993)). Here, however, the issue addressed by the state is at the heart of the district court's order. Day, therefore, advisedly, addressed the question in his opening brief. Except where noted, the amicus brief does not go beyond the scope of Day's argument.

Cir. 1984) ("*Keaukaha II*"). We have repeatedly applied this latter holding.[8]

The district court concluded, however, that *Akaka II*'s holding is no longer good law because it has been effectively overruled by *Gonzaga University v. Doe*, 536 U.S. 273 (2002). There are indeed circumstances in which a district court or a three-judge panel of this court can disregard circuit precedent because of intervening Supreme Court authority: "[W]here intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority[,] . . . a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir. 2003) (en banc). But, this is simply not one of those instances. *Gonzaga* and other recent Supreme Court cases concerning § 1983 rights have not so changed the law that it is now irreconcilable with our prior cases. The *Miller* standard is thus not met, and we (and the district court) are bound by our earlier precedent. Therefore, the district court should not have dismissed the case for failure to allege a right enforceable under § 1983.

## A.   *Breach of trust actions under the Admission Act*

Before explaining our conclusion regarding the impact of *Gonzaga*, we set the scene by describing our existing case law regarding the enforcement of the § 5(f) trust by beneficiaries in some detail.

Section 5(f) of the Admissions Act provides that the relevant lands and income from them

---

[8]*See Hou Hawaiians v. Cayetano,* 183 F.3d 945, 948 (9th Cir. 1999); *Price v. Hawaii*, 939 F.2d 702, 706 (9th Cir. 1991); *Price v. Hawaii,* 921 F.2d 950, 954-56 (9th Cir. 1990); *Price v. Akaka,* 915 F.2d 469, 472 (9th Cir. 1990); *Ulaleo v. Paty*, 902 F.2d 1395, 1397 (9th Cir. 1990); *Price v. Hawaii*, 764 F.2d 623, 628 (9th Cir. 1985).

*shall be held by said State as a public trust* for the support of the public schools and other public educational institutions, for the betterment of the conditions of Native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended, for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and for the provision of lands for public use. Such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and *their use for any other object shall constitute a breach of trust for which suit may be brought by the United States.*

73 Stat. at 6 (emphasis added).

**[1]** Prior to *Gonzaga*, we twice explicitly held that because it creates a trust, § 5(f) also creates a right enforceable under § 1983 by the trust's beneficiaries. In *Keaukaha II*, we reached that conclusion by relying on "a presumption that a federal statute creating enforceable rights may be enforced in a section 1983 action." 739 F.2d at 1470 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 51 (1981) (White, J. dissenting in part)). Our primary concern was whether the § 1983 remedy was foreclosed by the statute's public remedy. Earlier, in *Keaukaha I*, 588 F.2d 1216, we had concluded that the Admission Act did not create a implied private cause of action in part because the Act allowed the United States to sue for breach of trust. *Id.* at 1223-24. But in *Keaukaha II*, we concluded that the public remedy did not foreclose a § 1983 action because of the presumption in favor of a § 1983 remedy where a statute creates enforceable rights. 739 F.2d at 1470.

*Keaukaha II* recognized that "[t]here remains a question . . . whether the Admission Act created a federal 'right' enforce-

able under section 1983." *Id.* at 1471. While we observed that "[t]he Admission Act clearly mandates establishment of a trust for the betterment of native Hawaiians," we did not discuss the question in any detail, because "[t]he defendants [did] not seriously contend that plaintiffs have no enforceable rights." *Id.*

Our next substantive discussion of the issue was in *Akaka I*, 928 F.2d at 826-27. *Akaka I* considered Native Hawaiians' claim that OHA trustees violated § 5(f) by comingling § 5(f) trust funds with other funds, and by not spending the trust funds to benefit Native Hawaiians or to serve the other § 5(f) purposes. *Id.* at 826. We did not directly address the question of whether the statute created an enforceable right. But we did discuss the plaintiffs' rights, in explaining why they had standing even though the trustees could legally spend the § 5(f) funds for purposes other than to benefit Native Hawaiians:

> We recently considered this very question, and determined that allegations such as those Price has made are sufficient to show an 'injury in fact.' *See Price* [*v. State of Hawaii*, 764 F.2d 623, 630 (9th Cir. 1985) ]. In addition, allowing Price to enforce § 5(f) is consistent with the common law of trusts, in which one whose status as a beneficiary depends upon the discretion of the trustee nevertheless may sue to compel the trustee to abide by the terms of the trust.

*Akaka I*, 928 F.2d at 826-27.

Drawing directly on *Akaka I*, we explicitly returned in *Akaka II*, 3 F.3d 1220, to the enforceable rights question identified in *Keaukaha II*. That case addressed an issue similar to the one at bar: whether *Keaukaha II* had been effectively overruled by the Supreme Court's analysis of the "rights" element of § 1983 in *Suter v. Artist M.,* 503 U.S. 347 (1992), which concluded that there was no enforceable right in the

provisions of the Adoption Act of 1980 requiring states to meet certain prerequisites before receiving federal reimbursement for certain expenses related to adoption and foster care services. *See Akaka II*, 3 F.3d at 1224-26.

*Akaka II* held that *Keaukaha II* had not been so overruled. We explained why § 5(f) created an enforceable right by citing to *Akaka I*:

> The instant case involves a public trust, and under basic trust law principles, beneficiaries have the right to "maintain a suit (a) to compel the trustee to perform his duties as trustee; (b) to enjoin the trustee from committing a breach of trust; [and] (c) to compel the trustee to redress a breach of trust." Restatement 2d of the Law of Trusts, § 199; *see also id.* § 200, comment a. We have accordingly held that "allowing Price to enforce § 5(f) is consistent with the common law of trusts, in which one whose status as a beneficiary depends upon the discretion of the trustee nevertheless may sue to compel the trustee to abide by the terms of the trust." *Akaka I*, 928 F.2d at 826-27.

> Our decisions in *Keaukaha II*, 739 F.2d at 1472, and *Akaka I*, 928 F.2d at 828, holding that beneficiaries of the public trust created by Congress may bring a § 1983 claim are consistent with the Supreme Court's decision in *Suter*. Congress enacted the Admission Act, a federal public trust, which by its nature creates a federally enforceable right for its beneficiaries to maintain an action against the trustee in breach of the trust. As a beneficiary, Price may therefore bring a § 1983 action under the Hawaii Admission Act against the trustees.

*Id.* at 1224-25 (internal parenthetical omitted).

**[2]** *Akaka II*'s reliance on trust law was not unique. Unifying most of our § 5(f) case law is the understanding that because they are designated as a "public trust," § 5(f) funds are governed by a set of trust law principles that have procedural as well as substantive implications. *Akaka I*'s discussion of standing, quoted earlier, drew on the funds' status as a trust.[9] *See Akaka I*, 928 F.2d at 826-27. Furthermore, although we have as yet said little on the merits of § 5(f) claims, we have strongly suggested, if not explicitly held, that trust law princi-

---

[9]In a concurring opinion in *Rice v. Cayetano*, Justice Breyer expressed concern that the relationship between OHA and Native Hawaiians was not analogous to a trust for an Indian tribe. *See Rice*, 528 U.S. at 524-257 (Breyer, J. concurring). Justice Breyer noted that, unlike a trust for an Indian tribe, the lands ceded in the Admission Act are to benefit "*all* the people of Hawaii," not simply Native Hawaiians. *Id.* at 525. Furthermore, unlike an Indian trust, OHA has "funding . . . from several different sources" other than § 5(f) trust funds. *Id.*

Justice Breyer's characterization of OHA is accurate. The differences he describes between Indian trusts and the OHA, however, while perhaps relevant to the question at issue in *Rice* — about election of OHA officials — are not pertinent to this case or our prior applications of trust principles to § 5(f) claims for two reasons. *First,* at issue in this case and our prior related cases is only a portion of the OHA funds, those funds covered by § 5(f) and denominated by federal statute as held in "public trust." At issue in *Rice*, on the other hand, was the election of officials who managed *all* of OHA's assets, including funds that are *not* covered by § 5(f).

*Second*, in contrast with the Hawaiian governor's apparent position in *Rice*, this case is not based on any implicit assumption that Native Hawaiians and Hawaiians are the only intended beneficiaries of the § 5(f) trust. Our discussions of standing, rights of action, and the scope of the § 5(f) restrictions have arisen in cases brought by Native Hawaiian individuals and groups. But neither our prior case law nor our discussion today suggests that as a matter of federal law § 5(f) funds must be used for the benefit of Native Hawaiians or Hawaiians, at the expense of other beneficiaries. For example, our holding in *Akaka I* that Native Hawaiians have standing to sue to enforce the § 5(f) trust draws on the common law regarding trusts that, like this one, have multiple potential beneficiaries or are defined as "public." *See Akaka I*, 928 F.2d at 827 (citing Restatement 2d of the Law of Trusts, § 214(1), comment a (regarding the rights of multiple beneficiaries), and § 391 (regarding which beneficiaries may sue to enforce the terms of a public charitable trust)).

ples guide the merits of any § 5(f) claims. If nothing else, the words "public trust" in the Admission Act "betoken the State's duty to avoid deviating from section 5(f)'s purpose." *Price v. Hawaii*, 921 F.2d at 955-56. *But see id.* at 955 (concluding that because the Hawaii Admission Act "confers a broad authority upon the State," it does not impose any duties on the state regarding the management of the § 5(f) funds). And we have implied that the "body of law [applicable] for the purpose of enforcing" this duty likely draws on the common law of trusts. *Id.* ("There is no free floating federal common law of trusts, but we have no doubt that we would have the power to formulate a body of law for the purpose of enforcing the Act if that were appropriate under the circumstances. No doubt that would not present insuperable difficulties, since the common law of trusts is well developed in this country and speaks with a good deal of uniformity across the length and breadth of the land." (citations omitted)).[10]

---

[10]Courts have frequently looked to the common law of trusts to guide resolution of two sets of related claims: those concerning the federal government's management of Indian assets for which the government has a fiduciary duty, *see United States v. Mitchell*, 463 U.S. 206, 226 (1983), and those related to states' management of land granted to them in trust by the United States, *see Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 637 (10th Cir. 1998); *United States v. 111.2 Acres of Land*, 293 F. Supp. 1042, 1049 (E.D. Wash. 1968), *aff'd by*, 435 F.2d 561 (9th Cir. 1970) (per curiam, adopting the district court opinion*); Kadish v. Ariz. State Land Dep't*, 747 P.2d 1183, 1186-87 (Ariz. 1987); *County of Skamania v. State*, 685 P.2d 576, 579-80 (Wash. 1984) (en banc).

Although we do not address the merits of Day's claims, we note for the sake of example and clarity that the common law of trusts offers guidance on two of the issues that Day's claims present: (1) how a court should determine whether activities funded by the trust funds are "for the betterment" of Native Hawaiians, and (2) whether trust funds can be spent in a way that serves Native Hawaiians, but also, incidentally, benefits other individuals. One treatise suggests:

> To the extent to which the trustee has discretion, the court will not control his exercise of it as long as he does not exceed the limits of the discretion conferred upon him. . . . Even where the trustee has discretion, however, the court will not permit him to abuse the discretion. This ordinarily means that so long as he acts

Thus, *Akaka II* constitutes an integral part of our § 5(f) jurisprudence. A change in its holding would have substantive, as well as procedural, impact.

With the context set, we turn to the sole issue in this case: whether *Akaka II* remains the law of this circuit.

## B. The effect of recent Supreme Court cases

After *Akaka II* was decided, two Supreme Court cases — *Blessing v. Freestone*, 520 U.S. 329 (1997), and *Gonzaga*, 536 U.S. 273 — summarized, explained, and, on some points, refined the law regarding when a statute creates a right enforceable under § 1983. The two cases are now the natural starting point for analysis of the issue. *See generally Ball v. Rodgers*, No. 04-16963, ___ F.3d ___, 2007 WL 2034043, at *6-7 (9th Cir. July 17, 2007). Nevertheless, neither "undercut[s] the theory or reasoning underlying [*Akaka II* ] in such a way that the cases are clearly irreconcilable."[11] *Miller*, 335

not only in good faith and from proper motives, but also within the bounds of a reasonable judgment, the court will not interfere; but the court will interfere when he acts outside the bounds of a reasonable judgment.

Austin W. Scott & William F. Fratcher, 3 The Law of Trusts § 187 (4th Ed. 2001).

[11]The state of Hawaii, as amicus, also suggests that we should reconsider *Akaka II* in light of *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005). But, *Abrams* does not address whether a statute creates an enforceable right, as the defendants did not dispute that point. *Id.* at 120-21. Instead, *Abrams* concerned whether a § 1983 remedy for an acknowledged enforceable right was foreclosed by the availability of other remedies. *Id.* Hawaii suggests that *Abrams* requires a change in *Keaukaha II*'s related conclusion: that the public remedy in § 5(f) does not foreclose private enforcement. But that question is beyond the scope of this appeal. It is raised only in the amicus brief and was not addressed by the district court. *See United States v. Gementera*, 379 F.3d 596, 607-08 (9th Cir. 2004). We further note that with regard to alternative remedies, *Abrams* simply applies two Supreme Court cases, *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1 (1981) and *Smith v. Robinson*, 468 U.S. 992 (1984), both of which pre-dated *Akaka II* and *Keaukaha II*. *See Abrams*, 544 U.S. at 121.

F.3d at 900. Whether or not we would reach the same result as the *Akaka II* panel today, neither *Blessing* nor *Gonzaga* so affected the reasoning of *Akaka II* that the case has lost its binding force.

*Blessing*, for one, did not change the law relevant to *Akaka II*'s analysis. The Court in *Blessing* listed three factors to use in identifying which statutes create rights enforceable under § 1983:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States.

520 U.S. at 340-41(citations and quotation marks omitted). But while this "test" has since evolved into an analytical touchstone, *see, e.g., Sanchez v. Johnson*, 416 F.3d 1051, 1056-57 (9th Cir. 2005), *Blessing* did not create these factors from scratch. Rather, *Blessing* succinctly summarized three factors that the court had "traditionally looked at . . . when determining whether a particular statutory provision gives rise to a federal right." 520 U.S. at 340. And, *Blessing* drew those factors from two cases decided prior to *Akaka II*: *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 430-32 (1987) and *Wilder v. Virginia Hospital Ass'n.*, 496 U.S. 498, 509-12 (1990), the latter of which discussed all three factors later summarized by *Blessing*.

Not surprisingly, then, *Akaka II*'s reasoning is consistent with the three factors summarized in *Blessing*. By discussing the beneficiaries' rights and the corollary duties of trustees implied by the word "trust," the opinion addresses implicitly — and reasonably — the first and third factors in *Blessing*: that "Congress . . . intended that the provision in question

benefit the plaintiff," and that "the statute . . . unambiguously impose a binding obligation on the States." *Blessing*, 520 U.S. at 340-41; *Akaka II*, 3 F.3d at 1224-25. Because it is based on routinely enforced principles of trust law, *Akaka II*'s holding is also not "clearly irreconcilable" with the second *Blessing* requirement that a right be concrete enough to enforce.

**[3]** For similar reasons, we conclude that *Akaka II* is also not clearly irreconcilable with *Gonzaga*, 536 U.S. 273. Although *Gonzaga* arguably shifted the focus of § 1983 analysis more than *Blessing*, it did not so change § 1983 law as to create an irreconcilable conflict with *Akaka II*.

Clarifying a source of potential tension in earlier cases, *Gonzaga* enunciated three holdings concerning identification of § 1983 rights. First, the Supreme Court made clear that nothing "less than an unambiguously conferred right is enforceable by § 1983." 536 U.S. at 282. In other words, "broader or vaguer 'benefits' or 'interests' " are not enforceable under §1983. *Id.* at 283. Second, *Gonzaga* mandated that "implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983," because the two inquiries "overlap in one meaningful respect — in either case we must first determine whether Congress *intended to create a federal right.*" *Id.* Third, *Gonzaga* offered guidance for discerning the relevant congressional intent, emphasizing that "[f]or a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.' " *Id.* at 284 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)). In other words, " 'rights-creating' language [is] critical to showing the requisite congressional intent to create new rights." *Id.* at 287 (citing *Alexander v. Sandoval*, 532 U.S. 275, 288-89 (2001)).

As applied to the Admission Act, these three holdings neither dramatically change the law on which *Akaka II* relied nor create an irreconcilable conflict with the *Akaka II* reasoning.

Like *Blessing, Gonzaga* largely repeats rather than undercuts the law upon which *Akaka II* rested.

*Suter*, for example, stated that the key inquiry in § 1983 cases is "whether the [statutory] language in question created 'enforceable rights, privileges, or immunities within the meaning of § 1983. . . . Section 1983 speaks in terms of '*rights*, privileges, or immunities,' not violations of federal law." 503 U.S. at 357 (alterations and quotation marks omitted) (emphasis in original). *Akaka II* quoted this holding, and applied it by recognizing the *right* of beneficiaries to enforce trust obligations. 3 F.3d at 1224-25. Rather than suggesting an alternative form of analysis, Gonzaga repeated Suter's observation as its first holding, stating that because "Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States. . . . it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." 536 U.S. at 283.

For similar reasons, *Gonzaga*'s second holding, recognizing the overlap between implied right of action cases and § 1983 cases, also did not undercut *Akaka II*. At issue in *Gonzaga* was an apparent conflict between *Wilder*, a case which suggested that "implied private right of action cases have no bearing on the standards for discerning whether a statute creates rights enforceable by § 1983," *Gonzaga*, 536 U.S. at 283 (citing *Wilder*, 496 U.S. at 508-09 & n.4), and *Suter*, which "appear[ed] to disavow" that notion, *id.* (citing *Suter*, 503 U.S. at 363-64). *Gonzaga* explicitly adopted the approach of *Suter*, the case with which *Akaka II* was primarily concerned.

*Suter* also previewed *Gonzaga*'s third holding with regard to clear statutory language.[12] Prior to *Gonzaga*, *Suter* held that

---

[12]We note that it is not self-evident that *Gonzaga*'s third holding, regarding statutory language, applies to § 5(f) of the Admission Act. *Gon-*

rights must be conferred "unambiguously" by statutory language. *See Suter*, 503 U.S. at 358, 363. Specifically, *Suter* held that the statute at issue, the Adoption Act, did not create enforceable rights because, "[c]areful examination of the language . . . does not unambiguously confer an enforceable right upon the Act's beneficiaries." *Id.* at 363. *Gonzaga* quoted this holding with approval, summarizing it as a recognition that "[s]ince the [Adoption] Act conferred no specific, individually enforceable rights, there was no basis for private enforcement, even by a class of the statute's principal beneficiaries." 536 U.S. at 281; *see also id.* 283 (approving *Suter*'s reasoning); *id.* at 287 (emphasizing the need for statutory language that confers *individual* entitlements).[13]

---

*zaga*'s primary concern was the creation of enforceable rights by statutes enacted under the Spending Clause of the Constitution, art. 1, § 8, cl. 1. Although much of *Gonzaga*'s discussion is in general terms, the Court introduced its analysis with the observations that "[w]e made clear [in *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981)),] that unless Congress speaks with a clear voice, and manifests an unambiguous intent to confer individual rights, *federal funding provisions* provide no basis for private enforcement. . . . Since *Pennhurst*, only twice have we found *spending legislation* to give rise to enforceable rights." 536 U.S. at 280 (citations and alterations omitted; emphasis added). Furthermore, *Gonzaga* cited with approval *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989), which held — in contrast with *Gonzaga*'s focus on statutory language — that a non-Spending Clause statute could create rights by structural implication. *See Gonzaga*, 536 U.S. at 285; *Golden State*, 493 U.S. at 111-12.

We do not pursue this possible distinction further, however. Doing so would entail a determination of the constitutional basis for the enactment of § 5(f) and a comparison of that basis with the Spending Clause jurisprudence, issues that have not been briefed. Instead, we assume that the third prong of *Gonzaga* is fully applicable to § 5(f).

[13]"In response to the Court's reasoning in *Suter*, Congress enacted 42 U.S.C. § 1320a-2, sometimes called the "*Suter* fix". *See Watson v. Weeks*, 436 F.3d 1152, 1158 (9th Cir. 2006); *ASW v. Oregon,* 424 F.3d 970, 977 n.11 (9th Cir. 2005). Section 1320a-2 did not change the analysis in *Suter* applicable here and thus has no pertinence to the issues in this case.

As *Suter* was decided before and discussed in *Akaka II*, and *Gonzaga* on this point simply reaffirms *Suter*, we are not at liberty to disagree with *Akaka II*'s holding that the Admission Act's language clearly creates an individual right. The state nevertheless argues that *Akaka II*'s reasoning is irreconcilable with *Gonzaga*'s command to identify unambiguous statutory language. Even if we had authority to consider that question, we would see no such resounding conflict.

**[4]** In accordance with *Gonzaga*'s emphasis on statutory language, *Akaka II*'s analysis is based on the Admission Act's explicit use of the term "trust." The opinion's conclusion that the word "trust" refers unambiguously to a body of law describing the rights of individual beneficiaries to enforce the § 5(f) terms with regard to any particular expenditure of the § 5(f) funds may not be the only reasonable conclusion, but it is certainly colorable, and thus, reconcilable with *Gonzaga*.

*Gonzaga*'s emphasis on an unambiguous conferral of rights is essentially a clear statement rule that, like such rules in other contexts, reflects the principle that, "[i]n traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989) (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971)); *see, e.g.*, *Gregory v. Ashcroft,* 501 U.S. 452, 460 (1991) (regarding federal preemption of states' authority to choose their own officers); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (regarding abrogation of states' sovereign immunity); *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 99 (1984) (same); *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (regarding imposition of conditions on states under Spending Clause statutes). But *Gonzaga* does not signal that comprehensive statutory enunciation of a right and of its beneficiaries is always essential. Instead, Supreme Court precedent shows that statutory cross-references, references to

established legal principles, and other devices that, when followed to their sources, supply a clear message, can suffice to create a right.

As discussed above, *supra* note 12, *Gonzaga* cites with approval *Golden State Transit Corp.*, 493 U.S. 103 (1989), a case in which the Supreme Court concluded that a statute created rights by structural implication. *See Gonzaga*, 536 U.S. at 285. *Gonzaga* makes no mention of *Livadas v. Bradshaw*, 512 U.S. 107, 133-34 (1994), but that case reaches a conclusion similar to that of *Golden State*. Both *Golden State* and *Lividas* recognized a principle that could conflict with some readings of *Gonzaga:* "A rule of law [regarding the rights imposed by a statute] that is the product of judicial interpretation of a vague, ambiguous, or incomplete statutory provision is no less binding than a rule that is based on the plain meaning of a statute." *Golden State*, 493 U.S. at 112 (quoted in *Lividas*, 512 U.S. at 134 ). But unless and until the Supreme Court says otherwise, we must assume that this principle from *Golden State* is consistent with *Gonzaga* and remains good law.

Once *Gonzaga* is understood in light of the *Golden State* line of cases, it becomes clear that *Akaka II*'s analysis is reconcilable with *Gonzaga*'s clear statement rule. Under the *Golden State* principle, *Akaka II*'s analysis — based on judicial interpretation of the term "trust" — is undoubtedly sound. *Akaka II* relies on a much more straightforward, language-based statutory analysis than did *Golden State*.

Furthermore, the term "trust," when paired with the statutory reference to "breach of trust" actions and in light of the common law consequences that attached to the use of the term, is reasonably read to indicate plainly that the trustees have a duty not to breach the trust and that the trust's beneficiaries have corresponding rights to enforce it with regard to each expenditure of § 5(f) funds. Indeed, *Akaka II* is nothing more than a straightforward application of a statutory inter-

pretation rule that the Supreme Court discussed in the context of another clear statement analysis:

> Where [a legislature] borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.

*INS v. St. Cyr*, 533 U.S. 289, 312 n.35 (2001) (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952) and applying the rule to confirm that a statutory limitation on "judicial review" is not a "clear" limitation on courts' authority to issue writs of habeas corpus); *see also id.* at 311-12 (analyzing the history and context of the term "judicial review" before reaching a conclusion about its meaning).

### C. *The district court's analysis*

Our analysis of this issue differs not only in result but also in approach from that of the district court. The district court held that after *Gonzaga*, *Akaka II*'s reaffirmance that § 5(f) established a right enforceable under § 1983 was no longer good law, because that conclusion is irreconcilable with the Ninth Circuit's earlier holding in *Keaukaha I* that there was no implied private right of action under the Admission Act. This conclusion was based on a misunderstanding of *Gonzaga*.

The court read *Gonzaga* to equate the availability of an implied private right of action with the availability of a right enforceable under § 1983. But *Gonzaga* endorsed no such equation. To the contrary, *Gonzaga* stressed that "whether a statutory violation may be enforced through § 1983 is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute.

But the inquiries overlap in one meaningful respect — in either case we must first determine whether Congress *intended to create a federal right*." *Gonzaga*, 536 U.S. at 283 (quotation marks and citation omitted). In other words, under *Gonzaga*, the inquiry into whether there is a federal *right* is the same in the context of private rights of action and § 1983 rights. *Id.* The inquiry into whether there is a private right *of action* is different, however, from the inquiry of whether there is a private right *enforceable* through § 1983 because an implied private right of action requires "not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001); *see generally Price v. City of Stockton*, 390 F.3d 1105, 1109 n.3 (9th Cir. 2004).

*Keaukaha I*'s holding that the Admission Act created no implied private right of action is thus fully consistent with *Akaka II*, after *Gonzaga* as before. The former did not disavow the existence of a private right; to the contrary, *Keaukaha I* suggested there was such a right, but held that there was no private right of action because the statute created no *remedy* for the right. 588 F.2d at 1223-24 (concluding that the plaintiffs were part of the class for whose benefit the Admission Act was enacted, but finding no congressional intent to create a *remedy* for violations of the act).

**[5]** Because it is based on a misreading of *Gonzaga*, the district court's conclusion that *Gonzaga* so conflicts with this court's precedents as to require deviation from those precedents cannot stand.

## CONCLUSION

**[6]** We thus reaffirm what we have already held and reaffirmed: that each Native Hawaiian plaintiff, as a beneficiary of the trust created by § 5(f), has an individual right to have the trust terms complied with, and therefore can sue under § 1983 for violation of that right. Violations of this right may include, at minimum, wrongs of the type of which Day com-

plains: expenditure of funds for purposes not enumerated under § 5(f). We leave to the district court to interpret those § 5(f) purposes to determine in the first instance not only whether Day's allegations are true, but also whether the described expenditures in fact violate § 5(f). In doing so, we recognize the sore lack of judicial guidance on this point and the uncertainty that lack of guidance has injected into the policymaking environment. Cases related to the OHA's expenditure of funds for Native Hawaiians have reached our court on numerous prior occasions, but we and the district court have shed little light on the merits of § 5(f) claims. *See generally Arakaki v. Lingle*, 477 F.3d 1048, 1052-53 (9th Cir. 2007) (citing cases). Absent further foundational issues with Day's claim, today's affirmance of our existing precedent should permit much-needed elucidation of the substance of § 5(f).[14]

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

[14]We emphasize once more that we are expressing no view concerning the merits of the expenditure challenges.